**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　*Plaintiff-Appellee,*

v.

ROGER CHARLES DAY, JR.,

　　　　*Defendant-Appellant.*

No. 11-5218

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
John A. Gibney, Jr., District Judge.
(3:07-cr-00154-JAG-3)

Argued: October 26, 2012

Decided: November 29, 2012

Before WILKINSON, KING, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Shedd joined.

## COUNSEL

**ARGUED:** Richard Hans Maurer, MAURER/SONG PC, Philadelphia, Pennsylvania, for Appellant. Ryan Scott Faulconer, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Neil H. Mac-Bride, United States Attorney, Alexandria, Virginia, Elizabeth

C. Wu, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Roger Day Jr. was convicted of wire fraud, conspiracy to commit wire fraud, conspiracy to commit money laundering, and conspiracy to commit smuggling for his role as the mastermind of a multi-million dollar scheme to defraud the Department of Defense ("DOD"). The crux of Day's scheme involved the knowing supply of defective and nonconforming spare parts for use in U.S. military aircraft, vehicles, and weapons systems. Many of these were "critical application items"—that is, parts whose failure could jeopardize the lives of military personnel and the success of military operations. The district court imposed a sentence of 105 years in prison along with substantial fines, forfeitures, and restitution. Day now appeals his convictions and sentence on a variety of grounds. Finding his arguments without merit, we affirm the judgment of the district court.

I.

A.

In late 2004 and early 2005, Day began running a business scheme involving his then-girlfriend, Susan Crotty Neufeld, and his friends, Nathan Carroll and Greg Stewart. Acting at Day's direction, Neufeld, Carroll, and Stewart would set up companies that could bid on parts-supply contracts for the Defense Logistics Agency ("DLA"), the agency within the DOD responsible for acquiring parts for the military services. Using Day's custom-designed software program, the compa-

nies would then bid *en masse* on low-dollar value DLA contracts. When one of the newly formed companies won a contract, Day would purchase the necessary parts and have them shipped to Neufeld or Carroll, who would in turn deliver the parts to a packaging company for shipping to the DLA to complete the contract. Day would then share a portion of the profit with the others.

The arrangement between Day and his co-conspirators lasted three years, during which the various companies secured some 987 contracts worth approximately $8,670,380.78. Like all too many get-rich-quick ideas, however, this scheme was too good to be true. The trick was in the parts: rather than delivering parts that complied with the exacting military specifications called for in the various contracts, Day would purchase similar sounding—yet cheaper and nonconforming—items. For example, instead of the special military aircraft dome antennas that were the subject of one contract, Day obtained and directed his co-conspirators to deliver ordinary citizens band radio antennas. Similarly, rather than the valuable infrared halogen light filters requested by the DLA for nighttime use on F-16 fighter jets, Day and his co-conspirators delivered noncomplying recessed lighting components. Fifty-nine percent of the contracts obtained during the scheme involved "critical application items," or items that the military had determined to be essential to weapon system operation or the safety of operating personnel. When all was said and done, Day purchased the various nonconforming parts for, on average, just 3.77% of the amount that he received back in payment from the government.

The success of Day's scheme was predicated on the fact that, due to issues of cost and efficiency, the DLA could not individually inspect each delivered part for quality assurance prior to paying out many of its contracts. Thus, instead of rejecting noncomplying parts upon receipt and refusing to make payment, the DLA typically punished companies who had shipped such parts by debarring them from winning

future awards. Yet when the DLA identified the companies used by Day and his co-conspirators as the proper subject of debarment orders, Day circumvented those orders through the simple expedient of instructing his co-conspirators to form new companies, which could place and win bids on parts-supply contracts anew.

Early on in the scheme, in May 2005, Day moved to Mexico, where he directed Neufeld, Carroll, and Stewart through emails, phone calls, and internet chats. He initially instructed the three to route the proceeds of the scheme to him in Mexico in the form of checks that he would deposit in a Belizean bank account. However, the bank eventually shut down Day's account, leaving him without an easy way to pocket the proceeds of his project. Day reacted by instructing Carroll to convert his funds into gold and to physically bring the gold to him in Mexico.

The task of purchasing and then transporting the gold to Day in Mexico involved several complicated steps. First, Day told Carroll to purchase a large quantity of gold—some 2,030 ounces in gold bars and 1,522 ounces in gold coins—from a gold dealer in Arizona and to have the gold shipped to Carroll's residence in New Jersey. However, because Day did not wish to enter the United States to transport the gold personally, he instead asked other individuals to transport the gold for him. Thus, in July 2006, Carroll drove 197 gold bars (worth more than $1.3 million) from New Jersey to Houston, Texas, where he met Juerg Mehr, an auto mechanic whom Day had asked to help hide the gold inside the hollow front bumper of a Toyota Land Cruiser. Once the gold was hidden, Carroll picked up Stewart and drove across the U.S.-Mexico border where they met up with Day. The three of them then drove to Day's home in Lo De Marcos, where after waiting until nighttime, they hand-sawed the gold out of the Land Cruiser's bumper and placed it inside Day's home.

The next effort to transport gold to Day in Mexico did not meet with the same success, as Carroll was arrested by Mexi-

can authorities while attempting to cross the border in September 2006. Although he was released shortly thereafter, the arrest left Carroll unable to travel to Mexico and Day looking for a new courier. Day eventually recruited Glenn Teal, a former law enforcement officer. In February 2007, Teal flew to Houston where he met Carroll, Mehr, and a fourth individual. Together they hid roughly $850,000 worth of gold that Carroll had driven down from New Jersey inside the rear door panel of an Austrian Pinzgauer military transport vehicle that belonged to Day. Teal then drove the Pinzgauer into Mexico, where he met Day, and the two transported the gold together to Day's home in Lo De Marcos.

Within a month of this second delivery, however, the scheme began to unravel. Carroll and Stewart had run-ins with law enforcement officers in February 2007, after which Day sent Carroll an email instructing him to "stop bidding" on the DLA contracts. Carroll was arrested soon thereafter, on March 9. Day then abandoned his Mexican residence, assumed multiple fake identities, and began recruiting additional individuals to help him transport his gold, first from Mexico back to the United States and then to a gold dealer in Canada. Finally, after more than a year on the run, Day was arrested in July 2008 by Mexican authorities at the Cancun International Airport. He was subsequently detained at a Mexican prison where he awaited extradition to the United States.

In August 2008, a federal grand jury indicted Day for wire fraud conspiracy, 18 U.S.C. § 1349; wire fraud, 18 U.S.C. § 1343; aggravated identity theft, 18 U.S.C. § 1028A; money laundering conspiracy, 18 U.S.C. § 1956(h); smuggling conspiracy, 18 U.S.C. §§ 371, 554; and obstruction of justice, 18 U.S.C. § 1503. In December 2010, the Mexican government agreed to extradite Day to the United States on all charges other than the identity theft and obstruction counts.

### B.

After his extradition to the United States, Day was scheduled to be tried by a jury in the U.S. District Court for the Eastern District of Virginia in August 2011.

Prior to the trial, Day filed a motion in limine seeking to exclude a variety of evidence characterized as "uncharged money laundering and miscellaneous bad acts" on the grounds that such evidence would be unfairly prejudicial and irrelevant to the offenses that were actually charged. In particular, Day's counsel sought to bar the government from introducing evidence concerning Day's use of his Belizean and other bank accounts to deposit proceeds from his scheme, his use of various false names and identifications, and his purchase of several expensive watches while living in Mexico. After considering Day's arguments, the trial court denied the motion to exclude those disputed items of evidence, reasoning that they were really "part and parcel of the money laundering scheme" and not "attempts to slam [Day's] character."

During the eight-day trial, the government introduced testimony from a number of witnesses. One was Tom Higginbotham, a DLA engineer who tested several of the nonconforming parts that the government purchased from Day and his co-conspirators. On cross-examination of Higginbotham, Day's counsel sought to admit into evidence an internal agency report that had concluded that some of the parts Higginbotham tested had been mishandled by a government investigator in the case.

The government objected to the report's admission under Rule 403 of the Federal Rules of Evidence, arguing that it concerned a collateral matter whose probative value would be substantially outweighed by the risk of confusing the issues. The trial court agreed, reasoning that the "report does not suggest that . . . any of the evidence is tainted, or wrong in this case," a characterization with which defense counsel con-

curred. The court accordingly ruled that the report would yield little probative value, while posing a high risk of prejudice. The court did, however, permit Day to cross-examine the agent who had allegedly mishandled the evidence regarding the ways in which he may have violated agency procedures.

At the close of the trial, the court turned to the task of instructing the jury. During the charge conference, the government sought an instruction on aiding and abetting liability. Day's counsel did not object, and the trial court proceeded to instruct the jury that Day could be held liable under an aiding and abetting theory.

The trial judge also instructed the jury on the meaning of the word "proceeds" as it is used in the money laundering statute, 18 U.S.C. § 1956(a)(2)(B). Specifically, the judge instructed the jury—without objection—that the term "proceeds" includes "any interest in property that someone acquires or retains as a result of the commission of . . . a specified unlawful activity."

On August 25, 2011, the jury unanimously found Day guilty on all counts. During Day's sentencing hearing, the district court determined that based on his convictions and applicable sentencing enhancements, Day's Guidelines range was 1,260 months' imprisonment. One of the enhancements that the court found applicable was for obstruction of justice, U.S.S.G. § 3C1.1, which the court determined to be warranted because Day had "attempted to bribe United States and Mexican officials," "attempted to escape while in Mexico," and "at least plotted an escape while in jail" in Virginia.

After calculating the Guidelines range, the court considered the 18 U.S.C. § 3553(a) sentencing factors and determined that the 1,260-month sentence was appropriate. In particular, the trial judge noted that the "nature and circumstances of the offense are just absolutely vile," and that with respect to his

character, Day had exhibited "absolutely no conscience" and "no regret." The judge also explained that the need to protect the public from further crimes by Day was a "paramount consideration" in his sentencing determination because "if [Day] was released today he would think of his next scheme before sunset. . . . and would start to put it in action tomorrow." Finally, in addition to the term of imprisonment, the court imposed on Day a fine of $3 million, restitution of more than $6 million, and forfeiture consisting of gold, vehicles, and more than $2 million in cash.

Day now appeals his convictions and sentences, raising challenges on a number of grounds. We address each in turn.

## II.

Day's initial arguments concern the trial court's decision to instruct the jury that he could be convicted under an aiding and abetting theory. Day's counsel did not object to the aiding and abetting instruction, so we review his claims for plain error. *See Puckett v. United States*, 556 U.S. 129, 135 (2009). As explained below, his claims fail the first prong of this standard, for the jury instruction was not erroneous.

## A.

Day first argues that his convictions should be reversed because the trial court's aiding and abetting instruction amounted to a constructive amendment of his indictment. "A constructive amendment, also known as a 'fatal variance,' happens when the government, through its presentation of evidence or its argument, or the district court, through its instructions to the jury, or both, broadens the bases for conviction beyond those charged in the indictment." *United States v. Roe*, 606 F.3d 180, 189 (4th Cir.) (internal quotation marks omitted), *cert. denied*, 131 S. Ct. 617 (2010). Day asserts that the aiding and abetting instruction broadened the

bases of conviction in his case because his indictment neither mentioned nor charged that particular theory of liability.

Day's argument fails for the simple reason that—as this court and other courts have repeatedly held—a defendant "may be convicted of aiding and abetting under an indictment which charges only the principal offense." *United States v. Duke*, 409 F.2d 669, 671 (4th Cir. 1969); *see also, e.g.*, *United States v. McKnight*, 799 F.2d 443, 445 (8th Cir. 1986); *United States v. Galiffa*, 734 F.2d 306, 312 (7th Cir. 1984). Indeed, we observed just two years ago, in *United States v. Ashley*, that aiding and abetting liability "need not be charged in an indictment." 606 F.3d 135, 143 (4th Cir.), *cert. denied*, 131. S. Ct. 428 (2010).

This conclusion follows ineluctably from the rule against constructive amendments itself, which is focused not on particular theories of liability but on the *offenses* charged in an indictment. That is, a constructive amendment occurs only where an "indictment is altered to change the elements of the *offense* charged, such that the defendant is actually convicted of a crime other than that charged in the indictment." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (emphasis added) (internal quotation marks omitted). Yet as we explained in *Ashley*, aiding and abetting liability "does not set forth an essential element of the offense with which the defendant is charged or itself create a separate offense." 606 F.3d at 143. Instead, "aiding and abetting simply describes the way in which a defendant's conduct resulted in the violation of a particular law." *Id.* We therefore reject Day's contention that the aiding and abetting jury instruction was a constructive amendment.

## B.

Day next argues that his convictions should be reversed because the aiding and abetting jury instruction violated the extradition rule of specialty. As expressed in the United

States' extradition treaty with Mexico, the rule provides that "a person extradited under [this Treaty] shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted." Extradition Treaty Between the United States of America and the United Mexican States, art. 17, May 4, 1978, 31 U.S.T. 5059 ("U.S.-Mexico Extradition Treaty"). Day contends that the aiding and abetting instruction violated the rule in this case because Mexico did not grant—or even consider —extradition on the basis of aiding and abetting liability.

1.

Although the government disputes Day's contention on the merits, it argues as a threshold matter that Day lacks standing to raise the specialty violation in the first place. As we have noted before, the circuits are split on the question of whether an individual defendant has standing to raise a specialty violation, and the Fourth Circuit has yet to rule on the matter. *United States v. Davis*, 954 F.2d 182, 186 (4th Cir. 1992). The courts that have declined to find individual standing take the view that "only an offended nation can complain about the purported violation of an extradition treaty." *United States v. Kaufman*, 874 F.2d 242, 243 (5th Cir. 1989) (per curiam) (denying petition for rehearing and suggestion for rehearing en banc); *see also, e.g.*, *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973). In contrast, other courts have held that an individual "may raise whatever objections the extraditing country would have been entitled to raise." *United States v. Cuevas*, 847 F.2d 1417, 1426 (9th Cir. 1988); *see also, e.g.*, *United States v. Diwan*, 864 F.2d 715, 721 (11th Cir. 1989).

Because we conclude that Day's specialty argument fails on the merits, however, we need not resolve the government's standing argument now. To be sure, courts must resolve jurisdictional Article III standing issues before proceeding to consider the merits of a claim. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998). But the standing requirement

at issue here does not flow from Article III, for there is little question that an individual who is extradited for one offense but then tried for a completely different one suffers a concrete injury that is both fairly traceable to that prosecution and redressable by a favorable judicial ruling. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). The standing question here instead involves the *prudential* requirement that the interest a litigant seeks to assert must be within the "zone of interests" that the statute (or in this case, treaty) is designed to protect. *See, e.g.*, *Shapiro*, 478 F.2d at 906 (noting that the rule of specialty is "designed to protect [the asylum state's] dignity and interests," not the interests of the accused).

Unlike Article III standing, issues of prudential standing are non-jurisdictional and may be "pretermitted in favor of a straightforward disposition on the merits." *Finstuen v. Crutcher*, 496 F.3d 1139, 1147 (10th Cir. 2007) (internal quotation marks omitted). Accordingly, this court and others have assumed without deciding that an individual defendant has standing to assert a specialty violation where the defendant's position is readily disposed of on other grounds. *See, e.g.*, *Davis*, 954 F.2d at 186-87; *United States v. Sensi*, 879 F.2d 888, 892 n.1 (D.C. Cir. 1989). That is the case here as well.

2.

With respect to the merits, the flaw in Day's specialty argument is fundamentally the same as the flaw in his constructive amendment argument: aiding and abetting is a theory of liability, not a separate offense. Yet as the Supreme Court explained in its seminal decision recognizing the rule of specialty, *United States v. Rauscher*, the rule is keyed to particular offenses: it bars trying an extradited defendant for crimes other than "the *offense* with which he is charged in the proceedings for his extradition." 119 U.S. 407, 430 (1886) (emphasis added). The treaty between the United States and Mexico reinforces this point as it, too, prohibits the trial of a

person for "an offense" for which extradition has not been granted. U.S.-Mexico Extradition Treaty, art. 17, 31 U.S.T. 5059.

Thus, a paradigmatic example of a specialty violation would be a case in which the requesting state seeks extradition of a defendant for one offense, such as drug trafficking, but then proceeds to try the defendant on a different offense, such as securities fraud. Such a prosecution would violate the norm of international comity upon which the rule of specialty is premised. After all, if the United States wishes to protect its own citizens from bait-and-switch prosecutions when they are extradited for trial in a foreign nation, so too must it honor the same limitation in the reciprocal situation. *See United States v. Andonian*, 29 F.3d 1432, 1435 (9th Cir. 1994).

The rule's concern with unexpected prosecutions on unextradited *offenses* accordingly makes great sense. But aiding and abetting liability, far from being a separate offense, is closely linked to the principal violation. Its capacity to surprise or prejudice either the extradited defendant or the extraditing sovereign is therefore sharply limited. Moreover, the rule of specialty has never been used to limit a requesting state's ability to try a defendant for an extradited offense under a particular theory of liability, rule of evidence, or rule of procedure. *See, e.g.*, *United States v. Thirion*, 813 F.2d 146, 152-53 (8th Cir. 1987) (rule of specialty not violated by jury instruction regarding theory of co-conspirator vicarious liability); *United States v. Flores*, 538 F.2d 939, 944 (2d Cir. 1976) (rule of specialty "has never been construed to permit foreign intrusion into the evidentiary or procedural rules of the requisitioning state"). Consistent with this long line of decisions—and further undercutting Day's claim that the rule of specialty required Mexico to make a determination as to whether he could be tried under an aiding and abetting theory —the extradition treaty between the United States and Mexico makes absolutely no mention of theories of liability. *See* U.S.-Mexico Extradition Treaty, 31 U.S.T. 5059.

We accordingly hold that where, as here, a defendant is tried for the exact offenses described in his extradition agreement, the principle of specialty does not bar a trial court from instructing the jury that it may convict on such offenses under an unmentioned aiding and abetting theory.

3.

Day presses an additional specialty argument with respect to the trial court's sentence of forfeiture, which he contends was not mentioned in his extradition agreement. This, too, is without merit. For like the issue of jury instructions regarding particular theories of liability, a district court's decision to impose a judgment of forfeiture is collateral to the rule's concern over prosecutions on un-extradited *offenses*. A forfeiture judgment is not a free-standing criminal offense, but rather a particular form of punishment for otherwise proscribed conduct. *United States v. Saccoccia*, 58 F.3d 754, 784 (1st Cir. 1995). Thus, as the First Circuit explained in *Saccoccia*, "a defendant may be subjected to a forfeiture order even if extradition was not specifically granted in respect to the forfeiture allegations." *Id.* Underscoring this fact, the U.S.-Mexico Extradition Treaty says nothing about limitations on forfeiture. *See* U.S.-Mexico Extradition Treaty, 31 U.S.T. 5059. We therefore hold that the rule of specialty was not violated by the forfeiture judgment imposed against Day.

III.

Day next challenges his conviction for conspiracy to commit transportation money laundering in violation of 18 U.S.C. § 1956(a)(2)(b)(i). The statute makes it a crime to transport

> a monetary instrument or funds from a place in the United States to or through a place outside the United States . . . knowing that the monetary instrument or funds involved in the transportation . . . represent the proceeds of some form of unlawful

> activity and knowing that such transportation . . . is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)(2)(b)(i). Day's arguments concern three aspects of this statute: first, whether the government proved that Day transported gold with the requisite design to conceal; second, whether gold is a "monetary instrument or funds" covered under the statute; and third, whether the trial court issued an improper jury instruction on the meaning of the term "proceeds." We consider these arguments in turn.

### A.

Day's first argument involves the statute's requirement that a defendant must transport a monetary instrument or funds knowing that such transportation "is designed in whole or in part" to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds." 18 U.S.C. § 1956(a)(2)(b)(i). Day contends that the government did not prove the necessary design to conceal because even though Day and his confederates hid the gold in the process of transporting it across the Mexican border, the government did not prove that the *purpose* of the concealment was to hide the location, source, or ownership of the gold from the government. We review this challenge for sufficiency of the evidence, asking "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The essence of Day's argument is that the outcome of his case is dictated by the Supreme Court's decision in *Cuellar v. United States*, 553 U.S. 550 (2008). In that case, the Supreme Court held that there was insufficient evidence to convict a

defendant of transportation money laundering where the evidence only established that the defendant hid cash proceeds of drug trafficking under a floorboard in his car for the purpose of transporting it across the border to Mexico. *Id.* at 568. As the Court explained, "[t]here is a difference between concealing something to transport it," which is not punishable under the statute, and "transporting something to conceal it," which is. *Id.* at 566 (internal quotation marks omitted). In *Cuellar*, however, there was insufficient evidence of the latter purpose —that is, no evidence that would permit a reasonable jury to conclude that the transportation was designed to conceal an attribute listed in the statute. *Id.* at 567 n.8, 568. In fact, the only purpose of the transportation to which the government's own expert witness testified in *Cuellar* was to "compensate the leaders of the operation." *Id.* at 566 & n.7. So too here, argues Day, because even though the gold was hidden in order to get it across the border, the purpose of the transportation was simply to get the gold to Mexico in order to compensate him.

We do not think *Cuellar* sustains Day's argument. Although it held that "merely hiding funds during transportation is not sufficient to violate the statute," *id.* at 563, *Cuellar* also made clear that a jury may infer the requisite design to conceal based on circumstantial evidence that the defendant "knew that taking the funds to Mexico would have had one of the relevant effects" listed in the statute, *id.* at 567 n.8. In *Cuellar*, no such circumstantial evidence existed because the government did "not point[ ] to any evidence in the record" to support such an inference. *Id.* But here, the government has pointed to a record replete with evidence showing that Day not only knew that transporting the gold to Mexico would have the effect of concealing the location, nature, and source of his unlawful proceeds, but also that he transported the gold for precisely that purpose.

For example, just before Glenn Teal brought the second shipment of gold to Day in Mexico in February 2007, Day

told him that he "did not want to leave the gold" at Carroll's house in New Jersey. As Day explained to Carroll, he wanted to move the gold because he was "afraid that things were going to get hot" given that Stewart had just had a run-in with law enforcement officers. Indeed, Day's fears were confirmed when, shortly after he made these remarks, Carroll was arrested and his house was searched on March 9th—a search that would have turned up the gold (amounting to roughly $850,000 of the fraud scheme's proceeds) had Day not successfully concealed its location by transporting it to Mexico just days earlier. A rational jury could infer based on this evidence that one of the reasons why Day had the gold moved to Mexico was to conceal its location from American authorities who he (correctly) feared were on the verge of discovering its whereabouts—a quintessential act targeted by the transportation money laundering statute.

Moreover, the government adduced additional evidence indicating that Day intended through transportation of the gold to conceal the source, nature, and ownership of the fraud proceeds. For instance, Day steadfastly declined to move the gold himself; at least eight witnesses testified that Day asked them to help move the gold into and out of Mexico on his behalf. Day also used a false name when negotiating with a gold dealer to exchange the gold for a wire transfer. And a reasonable jury could have relied on the byzantine path that the gold took during the conspiracy. Just like Day himself after his scheme unraveled, it can truly be said in this case that the gold was on the lam: first from Arizona to New Jersey; then to Houston, Texas; next to Day's home in Lo De Marcos, Mexico; then to Juarez, Mexico; then back to the United States in Albuquerque; then to Washington; and finally to a gold dealer in Canada. In sum, based on that path and the other evidence of Day's purpose in moving the gold, we hold that a rational jury could have found the design to conceal element of transportation money laundering proven beyond a reasonable doubt.

B.

Day contends that even if there was sufficient evidence to support the design to conceal element, his conviction should be reversed because gold is not "a monetary instrument or funds" as required by 18 U.S.C. § 1956(a)(2). This challenge implicates two issues and two standards of review. First, Day's argument that the district court erred in interpreting the legal meaning of offense elements—in particular, the meaning of "monetary instrument" and "funds"—is subject to de novo review. *See United States v. Weaver*, 659 F.3d 353, 356 (4th Cir. 2011). Second, insofar as Day challenges the jury's finding that the government adequately proved the relevant offense element, we review that argument for sufficiency of the evidence. *See Jackson*, 443 U.S. at 319.

1.

Day's primary argument is that, as a matter of law, gold does not constitute a monetary instrument or funds under the money laundering statute. We note that the statute is phrased in the disjunctive: a person violates the law by transporting "a monetary instrument *or* funds" in accordance with the other elements of the offense. 18 U.S.C. § 1956(a)(2) (emphasis added). In order to prevail, then, Day must establish *both* that gold is not "a monetary instrument" and that it is not "funds" as expressed in the statute. Because we conclude that Day's argument fails with respect to the "funds" prong, we need not address whether gold may also be "a monetary instrument."

Day asserts that gold is not encompassed within the meaning of the term "funds" for two interrelated reasons: first, the money laundering statute does not define the term; and second, in the absence of a statutory definition, to permit the government to rely on definitions from dictionaries and other criminal provisions would render the statute unconstitutionally vague. Day is correct as to the former proposition—the money laundering statute does not define the meaning of

"funds"—but he is wrong as to the latter. It is beyond cavil that a criminal statute need not define explicitly every last term within its text, for as the Supreme Court has repeatedly explained, where "terms used in a statute are undefined, we give them their ordinary meaning." *Jones v. United States*, 529 U.S. 848, 855 (2000) (internal quotation marks omitted) (construing the meaning of "used" in 18 U.S.C. § 844(i)). In fact, in *Chapman v. United States*, the Court construed the undefined term "mixture" as it was used in 21 U.S.C. § 841(b)(1)(B)(v) by looking to its ordinary meaning—and proceeded to hold that such a construction did not leave the statute unconstitutionally vague. 500 U.S. 453, 462, 467-68 (1991).

Turning to the ordinary meaning of "funds," we think the term refers to assets of monetary value that are susceptible to ready financial use. This is the meaning captured by *Black's Law Dictionary*, which defines "fund" as a "sum of money or other liquid assets established for a specific purpose." *Black's Law Dictionary* 743 (9th ed. 2009). A "liquid asset" is defined by cross-reference to "current asset," *id.* at 1014, which means "[a]n asset that is readily convertible into cash," *id.* at 134. So too is this ordinary meaning expressed in non-legal dictionaries: Random House defines "funds" to mean "money immediately available; pecuniary resources." *Random House Dictionary of the English Language* 776 (2d ed. 1987). "Pecuniary" is defined, in turn, to mean "of or pertaining to money." *Id.* at 1428. We accordingly conclude that gold can constitute "funds" under the transportation money laundering statute where it is moved as a liquid, monetary asset.

Our conclusion finds support in the purpose and structure of the money laundering statute. At its core, Day's argument is that a defendant can violate the transportation money laundering provision if he moves cash or some other ordinary financial instrument with a design to conceal its source, ownership, or other listed attribute, but not if he takes the further deceitful step of first converting the cash into the more

difficult-to-trace financial asset of gold. To accept Day's argument would turn the transportation money laundering statute on its head, creating an odd safe harbor for criminals to transport and conceal their criminal proceeds where they engage in *more* deceit and concealment, not less. We do not think Congress could have intended such a result, and we thus hold that gold can constitute "funds" within the ordinary meaning of 18 U.S.C. § 1956(a)(2).

2.

Having settled in the affirmative the legal question of whether gold can ever constitute "funds" under 18 U.S.C. § 1956(a)(2), we must next consider whether the government presented sufficient evidence for a jury to conclude in this case that Day transported gold as "funds" under the ordinary meaning of that term. We hold that it did.

The government adduced testimony from Carroll, Neufeld, and Stewart that Day specifically referred to gold as a good financial "investment" in conversations with each of them. The government also introduced testimony from a gold dealer who explained that people commonly hold "gold funds" as a pecuniary investment asset, and that "[g]old is an investment for many many people." Significantly, during the conspiracy, Day used his gold in a manner that took advantage of its liquidity as an investment asset, essentially using it as a substitute for cash. To that end, a Canadian gold dealer testified that Day made a "series of transactions" in which he shipped gold in exchange for cash wire transfers. Day's counsel even declared during his opening statement that one reason why Day "had gold shipped to him in Mexico" was "[s]o he can spend it." Day's counsel also highlighted the liquid, pecuniary nature of gold during his closing argument, when he stated that "gold is something you can hold in your hand with a serial number on it. That is the value. That is what you can take into the gold dealer."

That sufficient evidence existed for a jury to conclude that Day transported gold in its capacity as "funds" does not mean, of course, that every transportation of gold necessarily qualifies as such. If Day had transported the gold for the purpose of filling or crowning a tooth, to make jewelry, or to manufacture microprocessors, such uses would not have fallen within the ordinary understanding of a "fund" as a "sum of money or other liquid asset" or "pecuniary resource." It hardly needs mentioning, though, that no such evidence was adduced in Day's defense; the government instead demonstrated that Day's gold remained in bar and coin form throughout the scheme and was used essentially as a bank account for his various exchanges with gold dealers. In sum, there was ample evidence for a jury to conclude that Day transported the gold in its capacity as a liquid, monetary asset.[1]

## IV.

Day next argues that venue for his criminal trial was improper in the Eastern District of Virginia. To establish venue, the government must adduce sufficient evidence for a reasonable jury to conclude that the defendant committed an overt act in furtherance of the charged conspiracy inside the

---

[1]Day's last challenge to his money laundering conspiracy conviction concerns the trial court's jury instruction that the term "proceeds" encompassed "any interest in property that someone acquires or retains as a result of . . . specified unlawful activity." This challenge fails, however, because a "defendant in a criminal case cannot complain of error which he himself has invited." *Shields v. United States*, 273 U.S. 583, 586 (1927) (internal quotation marks omitted). Here, Day and the government jointly proffered the very "proceeds" jury instruction that he now objects to on appeal, precluding him from challenging the instruction at this juncture. *See United States v. Collins*, 372 F.3d 629, 635 (4th Cir. 2004) (challenge to jury instructions that defendants themselves requested was barred as invited error). Moreover, his claim is meritless in any event because Day's exposure to money laundering liability is not based on transactions that were essential to his predicate fraud offenses, but rather on the entirely separate criminal act of concealing the location and ownership of his fraud proceeds by transporting gold to Mexico.

appropriate judicial district. *United States v. Green*, 599 F.3d 360, 374 (4th Cir. 2010); *see also* 18 U.S.C. § 1956(i)(2).

Contrary to Day's claims, venue was proper in the Eastern District of Virginia based on at least two classes of overt acts. First, a jury could have reasonably concluded that venue was justified based on phone calls that Carroll made in furtherance of the conspiracies while in the Eastern District of Virginia. Carroll testified that in May 2006, while in Crewe, Virginia, he made phone calls to (and received a phone call from) a gold dealer in Arizona to "shore up the pricing" for Day's gold purchases. In addition, the jury could have reasonably concluded that emails sent by Day's co-conspirators to DLA personnel in Richmond, Virginia, constituted overt acts in furtherance of the wire fraud, money laundering, and smuggling conspiracies. For instance, Stewart sent multiple emails to DLA personnel located within the district regarding contracts that one of his companies had won during the wire fraud scheme and on which he had received payment from the DOD in a specified account. Day and his co-conspirators subsequently used funds from that same account to, among other things, pay Mehr and Teal to transport the gold to Mexico.[2]

Day argues that the foregoing acts were "de minimis in context" and "completely legal," and therefore insufficient to give rise to venue in the district. In making this argument, however, Day confuses the question of *how much* an overt act furthers a conspiracy with the question of *whether* it furthers the conspiracy. It is the latter question that matters for venue purposes, and the circuits have recognized that simple acts such as phone calls from a district can give rise to venue in conspiracy cases. *See, e.g.*, *United States v. Smith*, 198 F.3d 377, 382 (2d Cir. 1999); *United States v. Lewis*, 676 F.2d 508,

---

[2]Because we find the emails and phone calls sufficient to establish venue, we need not reach the question of whether certain flights that Teal took over the Eastern District of Virginia en route to Houston, Texas also gave rise to venue.

511 (11th Cir. 1982). Venue was therefore proper in the East-
ern District of Virginia.

## V.

Day's final challenges to his convictions concern the trial
court's evidentiary rulings with respect to (1) a government
report describing mishandled evidence, and (2) bad act evi-
dence under Federal Rule of Evidence 404(b). We review the
trial court's rulings for abuse of discretion and "will only
overturn an evidentiary ruling that is arbitrary and irrational."
*United States v. Cloud*, 680 F.3d 396, 401 (4th Cir.) (internal
quotation marks omitted), *cert. denied*, 81 U.S.L.W. 3164
(2012). Upon examining the record, we hold that the district
court did not err in either ruling. Moreover, given the volume
of incriminating evidence produced, any error would have
been harmless.

## A.

Day argues that the district court abused its discretion by
declining to admit a government report of an investigation
that described how several pieces of evidence used to convict
him—namely, certain nonconforming parts that Day had
delivered to the DOD during his wire fraud scheme—were
mishandled by a particular lead investigator. Day first con-
tends that the report should have been admitted into evidence
under Federal Rules of Evidence 401 and 402 because the
report was relevant to the integrity of the evidence presented
to the jury, including issues regarding chain of custody and
unauthorized access to the evidence.

We find this argument unpersuasive. For starters, the trial
court's decision to exclude the report was founded not on a
determination that the report was irrelevant under Rules 401
and 402, but rather on a Rule 403 finding that the report's
"improperly prejudicial harm" would "exceed[ ]" its probative
value. This finding was soundly reasoned. In particular, with

regard to the report's limited probative value, the trial court specifically asked Day's counsel whether he had any reason to "contend that any of these chain of custody rules were violated," to which counsel candidly responded "[n]ot at this time." The court then inquired whether Day's counsel had "any evidence that shows that" the "[mishandled] evidence was in any way mutilated or damaged so that the quality of the testing [might be] called into question." Again, Day's counsel forthrightly responded "no." The district court itself found that the report "does not suggest . . . that any of the evidence is tainted, or is wrong in this case." Given the limited probative value of the report, the district court reasonably concluded that introducing the report would present a real danger of unfair prejudice given its general conclusion that a lead investigator had not complied with certain DOD evidentiary procedures.

Day also argues that he should have been permitted to introduce the report for a separate purpose: to impeach the lead investigator's character for truthfulness under Federal Rule of Evidence 608(b). This argument fares no better. In contrast to Day's assertion, Rule 608(b) does not require the admissibility of extrinsic evidence for the purpose of impeaching a witness's character for truthfulness—it actually does the opposite. The rule provides that "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is *not admissible* to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b) (emphasis added). Rule 608(b) instead allows for precisely what the district court did here: "the court may, on cross-examination, allow [instances of a witness's conduct] to be inquired into if they are probative of the character for truthfulness or untruthfulness." *Id.* Thus, the district court properly gave Day wide latitude to cross-examine the lead investigator regarding his conduct, permitting inquiry into his unauthorized access to the evidence room, inaccurate inventory of parts, and failure to document evidence transfers, custody forms, and shipping information.

We accordingly hold that the district court did not abuse its discretion in excluding the report.

### B.

Day next contends that the trial court abused its discretion in admitting certain uncharged "bad act" evidence against Day, including evidence about his use of foreign bank accounts and false names, and his purchase of several expensive watches. Day argues that the introduction of this evidence violated Federal Rule of Evidence 404(b), which prohibits introduction of such other acts for the general purpose of "prov[ing] a person's character in order to show that on a particular occasion the person acted in accordance with the character."

We reject this argument for the simple reason that it fails to recognize the distinction between extrinsic other act evidence and intrinsic other act evidence. *See United States v. Lighty*, 616 F.3d 321, 352 (4th Cir. 2010). As we have explained, evidence of uncharged other acts is intrinsic and not subject to Rule 404 if the acts "arose out of the same series of transactions as the charged offense, or if [evidence of the uncharged conduct] is necessary to complete the story of the crime on trial." *United States v. Siegel*, 536 F.3d 306, 316 (4th Cir. 2008) (alteration in original) (internal quotation marks omitted). The evidence of which Day complains falls within this definition because each item arose out of the same series of transactions as the charged offenses and was necessary to complete the context of the crime on trial: Day's foreign bank transfers took place during the heart of the scheme, in 2006-07, and involved proceeds from the DLA contracts; the false name evidence demonstrated Day's effort to conceal his connection to the scheme's proceeds; and evidence concerning his watch purchases showed one in-kind medium through which Day received proceeds from the scheme. The trial court did not abuse its discretion in admitting this evidence.

## VI.

We turn now to Day's challenges to his sentence of imprisonment. Specifically, Day argues that his 1,260-month prison sentence should be vacated because it was both procedurally and substantively unreasonable. We reject each argument for the reasons below.

### A.

Day argues that the district court committed procedural error when it imposed an unwarranted two-level enhancement for obstruction of justice, resulting in an incorrect calculation of his Guidelines range. The trial court's obstruction enhancement was proper for many reasons, however, among them that Day had attempted to bribe Mexican officials in an effort to escape from custody. Day also physically tried to escape from Mexican authorities. Further, Day had formulated a plan to enlist Mexican cartel members to conduct an attack on a prison van in which he would be transported in yet another attempted prison escape, this time in Virginia. Day has shown none of these factual findings to be clear error. *See United States v. Chandia*, 675 F.3d 329, 337 (4th Cir. 2012).

### B.

Day next argues that his prison sentence should be vacated as substantively unreasonable. "Substantive reasonableness examines the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010). If "the sentence is within the Guidelines range," we are permitted to apply on appeal "a presumption of reasonableness." *Gall v. United States*, 552 U.S. 38, 51 (2007).

Our review of the sentencing transcript reveals that the trial court closely considered the § 3553(a) sentencing factors and

chose the 1,260-month sentence based on the serious nature of Day's offense, his dangerous character, and the need to protect the public. With regard to the severity of the offense, the court observed that Day's scheme "was a calculated, sophisticated theft" that exposed the men and women of the armed services to serious risk of injury, or worse. For instance, the court noted that because of Day's scheme "[t]here could be a soldier in the field who is wounded and needs cover from a jet, and that jet has the wrong antenna shipped out there and is unable to provide that cover." Or "[t]here could be a soldier in the field who needs a Humvee to come pick him up because he is wounded and that Humvee can't come because the wrong parts were there." "Day never thought about those impacts on others, or he thought about them and said, I am going to go ahead with my offense any way." At bottom, the court concluded, the "nature and circumstances of [his] offense are just absolutely vile."

With respect to the defendant's character, the court repeatedly emphasized that Day possesses "absolutely no conscience," noting that he "steals everything he can lay his hands on," and "has no regret about dragging his friends down." And with respect to the need to protect the public from further crimes by Day, the court observed that this sentencing factor was a "paramount consideration" because "if [Day] was released today he would think of his next scheme before sunset. . . . and would start to put it in action tomorrow."

Notwithstanding the court's detailed consideration of the § 3553(a) factors, Day argues that the sentence was substantively unreasonable for two reasons. First, he argues that the trial court's sentence failed to account for alleged prison abuses he suffered in Mexico. Not so. In point of fact, the court expressly took his claim of mistreatment "into account," concluding that it was "not convinced that [Day's] imprisonment in Mexico was as bad as he says it is." Moreover, the court explained that even if it "was convinced" that the abuse

occurred, "what happened to him in Mexico does not outweigh what he did in his criminal behavior in this case." Thus, the district court considered Day's prison abuse argument and had a reasonable basis for its sentence notwithstanding it.

Second, Day argues that the district court's imposition of the 1,260-month sentence under the Guidelines was unreasonable because the court based the sentence on a factor—harm to military personnel—that was "speculative" and "unsupported by the evidence." Specifically, Day complains of the government's inability to "identify a bona fide 'warfighter' who was frustrated, limited in her mission, or even wounded." But the trial court's choice of sentence was not predicated on particular injuries suffered by particular servicemen and servicewomen. The trial court instead focused on the risk of harm to members of the armed forces as powerful evidence of Day's "absolute lack of consci[ence]." And on that front, the trial court's conclusion was fully supported by the record: as a chief DLA engineer explained, fully 59% of the contracts obtained by Day were for "critical application items," or items that the military itself has classified as "essential" to the "preservation of life or safety of operating personnel" or "weapon system performance." We accordingly reject Day's substantive unreasonableness claim.

## VII.

Day's final arguments concern the interplay between the Supreme Court's recent decision in *Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012), and the trial court's decision to impose (1) a $3 million fine, (2) more than $6 million in restitution, and (3) a forfeiture award of more than $2 million plus gold and vehicles. In *Southern Union*, the Supreme Court held that the rule of *Apprendi*—that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"—applies to criminal fines. *Id.* at 2350 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490

(2000)). Day contends that under this rule, his fine, restitution, and forfeiture must all be vacated because each required fact-finding by a jury that did not occur. For the reasons that follow, we disagree.

A.

Day asks us to vacate his $3 million fine because it "was not based upon facts already found by the jury, which was concerned strictly with whether Day had violated the wire fraud, money laundering, smuggling, [and] conspiracy" statutes. Because Day's counsel did not raise this argument below, we review it now for plain error. *See Puckett*, 556 U.S. at 135.

In *Southern Union*, the Supreme Court explained that the rule of *Apprendi* precludes "judicial factfinding that enlarges the maximum punishment a defendant faces beyond what the jury's verdict *or the defendant's admissions* allow." 132 S. Ct. at 2352 (emphasis added). As relevant here, the criminal fine statute provides that the maximum fine to which a defendant may be subject is "twice the gross gain or twice the gross loss" produced by the offense. 18 U.S.C. § 3571(d). Thus, for Day's $3 million fine to be consistent with *Apprendi*, either the jury's verdict or Day's own admissions must establish that Day enjoyed a gross gain of $1.5 million through his wire fraud scheme (or that his victims suffered a loss of the same amount).

Based on our review of the record, we hold that no *Apprendi* error occurred because Day's admissions established both that he enjoyed a gross gain in excess of $1.5 million and that his offense produced a loss of at least the same amount—either of which alone would be sufficient to support the $3 million fine. To wit, Day admitted in a Rule 29 motion filed in September 2011, that it was "undisputed at trial" that he received "94.7% of the total gold" purchased during his scheme. Given that Day proffered bank records indicating that

the total value of the gold purchased during the scheme was $2.29 million, Day's own admissions established that he received a gain of at least $2.16 million, which would support a fine of up to $4.32 million. Likewise, Day admitted at sentencing that his offense caused a loss of no less than $2.5 million, an amount that would support a fine of up to $5 million. Thus, because Day's admissions enlarged the maximum fine to which he could be sentenced to an amount in excess of the $3 million sum that was actually imposed, we hold that no *Apprendi* error took place. Moreover, given the substantial undisputed evidence of loss far in excess of the amount necessary to justify the fine imposed, Day cannot demonstrate that any error affected his substantial rights, much less the integrity or public reputation of the criminal proceedings.

### B.

Day next argues that the trial court's imposition of restitution in excess of $6 million violated *Apprendi* because the jury did not find facts giving rise to that amount. Again, because Day's counsel did not press any *Apprendi* challenge below, we review for plain error. *See Puckett*, 556 U.S. at 135.

Day's restitution argument is unavailing, although for a different reason than that which supports the imposition of his fine. For unlike that challenge, which is encompassed by *Southern Union*'s holding that "*Apprendi* applies to the imposition of criminal fines," 132 S. Ct. at 2357, there is the initial question in the restitution context of whether *Apprendi* applies at all. Prior to *Southern Union*, every circuit to consider whether *Apprendi* applies to restitution held that it did not. *See United States v. Milkiewicz*, 470 F.3d 390, 403 (1st Cir. 2006) ("[L]ike all of the other circuits to consider this question, we conclude that [*Apprendi* does] not bar judges from finding the facts necessary to impose a restitution order."). Day argues that we should break ranks with these prior deci-

sions in light of *Southern Union* and apply *Apprendi* to restitution because it is "similar" to a criminal fine.

We decline to take Day's suggested course. As an initial matter, we note that *Southern Union* does not discuss restitution, let alone hold that *Apprendi* should apply to it. Instead, far from demanding a change in tack, the logic of *Southern Union* actually reinforces the correctness of the uniform rule adopted in the federal courts to date. That is, *Southern Union* makes clear that *Apprendi* requires a jury determination regarding any fact that "increases the penalty for a crime beyond the prescribed statutory maximum." 132 S. Ct. at 2350 (quoting *Apprendi*, 530 U.S. at 490). Thus, in *Southern Union* itself, the *Apprendi* issue was triggered by the fact that the district court imposed a fine in excess of the statutory maximum that applied in that case. *Id.* at 2349.

Critically, however, *there is no prescribed statutory maximum* in the restitution context; the amount of restitution that a court may order is instead indeterminate and varies based on the amount of damage and injury caused by the offense. *See* 18 U.S.C. §§ 3663(b), 3663A(b). As a consequence, the rule of *Apprendi* is simply not implicated to begin with by a trial court's entry of restitution. As the Sixth Circuit aptly explained in *United States v. Sosebee*, "restitution is not subject to [*Apprendi*] because the statutes authorizing restitution, unlike ordinary penalty statutes, do not provide a determinate statutory maximum." 419 F.3d 451, 454 (6th Cir.), *cert. denied*, 546 U.S. 1082 (2005). That logic was sound when written before *Southern Union*, and it remains so today.

## C.

Finally, Day argues that the district court erred in imposing a forfeiture award of 3,496 ounces of gold, two vehicles, and a $2,128,549.50 money judgment. This claim fails at its inception, however, because like our conclusion with respect to restitution, *Apprendi* does not apply to forfeiture. As we

explained in *United States v. Alamoudi*, "[b]ecause no statutory or other maximum limits the amount of forfeiture, a forfeiture order can never violate" *Apprendi*. 452 F.3d 310, 314 (4th Cir. 2006). Nor, as discussed above, does the Supreme Court's decision in *Southern Union* change this fact, as that decision did not concern forfeiture and instead reinforces the essential requirement that a statute must prescribe a maximum punishment in order to implicate *Apprendi* concerns.

What is more, the Supreme Court has expressly held that "the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection." *Libretti v. United States*, 516 U.S. 29, 49 (1995). We do not think the Supreme Court intended to overrule this holding, *sub silentio*, in *Southern Union*. We therefore hold that the rule of *Apprendi* does not apply to a sentence of forfeiture. Moreover, nothing in Day's contentions persuades us that the fairness or integrity of proceedings was affected in any manner that would cause us to vacate under plain error review either the restitution or forfeiture rulings.

## VIII.

We have reviewed each of Day's various claims with care and find them all without merit. For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*