Filed 11/26/13  P. v. Hogg CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J. BRENT HOGG,<br><br>        Defendant and Appellant. | A135770<br><br>(Contra Costa County<br>Super. Ct. No. 05-110561-8) |

## I.  INTRODUCTION

Appellant J. Brent Hogg appeals from the restitution order made after he entered a guilty plea to a misdemeanor violation of Penal Code section 647.6, subdivision (a)(1),[1] annoying or molesting a child under 18 years of age.  Following a hearing, the trial court approved a direct victim restitution request of over $80,000 for mental health services.  Appellant contends he was unable to defend against the claim because he was barred from reviewing any of the victim's medical or counseling records underlying the restitution claim.  He argues that this restriction violated his constitutional rights and constituted an abuse of the trial court's discretion.  We will affirm.

---

[1] All further unspecified statutory references are to the Penal Code.

1

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

In October 2010, Detective Kristina Werk of the Concord Police Department contacted Jane Doe over the telephone after receiving a suspected child abuse form from a mandated reporter in Santa Barbara.

Werk testified that, in October 2002, Jane Doe began attending Wednesday night youth meetings at Faith Missionary Baptist Church in Concord. Minister Gary Weidenbach drove Jane Doe from her home in Danville to these meetings because she was a friend of his daughter J.W. Jane Doe was 14 years old at the time, and was going through "hard times at home." Appellant was a youth pastor leader at the meetings, and he and Jane Doe engaged in mutual flirtation. Jane Doe liked the attention appellant gave her.

One evening when Jane Doe was 14 or 15, Minister Weidenbach was unable to give her a ride home, so appellant gave her a ride. On the drive home, appellant asked Jane Doe if she wanted a massage. She said she did, and appellant began rubbing her shoulders and neck. He then reached his hand under her bra and fondled her breast for about 10 minutes, until they got to her home. Another similar incident occurred on another occasion. Jane Doe continued to attend the weekly church meetings after these incidents.

These two incidents were reported years later, in October 2010, when an extern at Santa Barbara Cottage Hospital, Jasmine Llamas, contacted the Concord Police Department and gave them Jane Doe's contact information. At the time, Jane Doe was 22 years old and living in Santa Barbara.

Detective Werk interviewed appellant, who admitted that he was the youth pastor at the church and had twice driven Jane Doe home. He also admitted that he had massaged her neck during both rides. Appellant demonstrated how he massaged Jane Doe's neck and upper chest area, but denied touching her breast. When Detective Werk

___

[2] Since appellant pled guilty, the facts of the underlying offense are taken from the preliminary hearing transcript and the probation officer's report.

asked appellant if Jane Doe's accusations could possibly be true, appellant stated that if his idea of what the breast is and Jane Doe's idea of what the breast is were different, then it was possible that what she was saying was true. Detective Werk explained the allegations that appellant had placed his hand under her shirt and bra and on her breast. Appellant stated it was possible that his hand could have glanced her breast area. Appellant told Detective Werk that, after touching Jane Doe, he thought to himself, "What's wrong with me?"

On April 20, 2011, the Contra Costa County District Attorney filed an information charging appellant with two counts of committing a lewd act upon a child who was 14 or 15 years old by a person 10 or more years older, in violation of section 288, subdivision (c)(1), a felony. The acts were alleged to have occurred between March 2003 and August 2004.

On November 8, 2011, the information was amended to add a third count for annoying or molesting a child under 18 years of age in violation of section 647.6, subdivision (a)(1), a misdemeanor. That same day, appellant pled guilty to the misdemeanor and the other counts were dismissed. However, the dismissed counts could be considered at sentencing. In reciting the terms of the plea for the record, the prosecutor stated that he would "have an amount at the date of sentencing for the Court and for counsel as to the restitution."

At the December 30, 2011, sentencing hearing, several witnesses gave statements, including Jane Doe. The prosecution requested a victim restitution order for $82,949.09 in mental health expenses and $121.40 in travel expenses. The court suspended imposition of sentence and placed appellant on three years probation with conditions, including 270 days in the county jail, lifetime sex offender registration, and a court restitution fine of $100. A probation revocation fine of $100 was imposed but suspended, and the court set victim restitution at $83,000. Defense counsel objected and requested a hearing to establish the amount of restitution appellant would be required to pay.

The restitution hearing was held on April 13 and May 25, 2012. Following the hearing, the court ordered restitution to the victim in the amount of $80,591.80 for mental

health services and to the California Victim Compensation and Government Claims Board (Victim Compensation Board) in the amount of $346.50 for the victim's mental health services.

On June 8, 2012, appellant filed a notice of appeal.

*Restitution*

The restitution request was provided to appellant's counsel at the sentencing hearing on December 30, 2011. The victim sought a total amount of $83,070.49, of which $82,949.09 was for mental health services and $121.40 was for travel expenses to court. The mental health service charges were set forth in a four-page document from Anthem, Jane Doe's health insurer. The expenses were incurred primarily at the Menninger Clinic for services provided in 2010 and 2011. The document listed dates of treatment, amounts charged, and providers, but contained no information on the nature of the treatment or the cause of the victim's need for treatment. The restitution request also contained receipts for $121.40 for airfare, but no medical records or other information to support the demand.

During the hearing, the victim made the following statement: "The crime that Brent Hogg committed has resulted in a series of emotional issues that have affected me throughout the past eight years. After the abuse, I became convinced that I would never be able to trust an adult to protect me. Especially a male adult. Before the relationship with Brent became sexual, I thought that he was a friend and I looked to him as a mentor within the church community as I became more involved with the Baptist church. After he began to speak to and touch me inappropriately, I felt ashamed, alone and developed extreme self-hatred.

"I had great difficulty remaining as a member of the church because I could not be around Brent and his wife and family without feeling guilty about the inappropriate relationship that he and I had when I was a teenager. I wanted to have a religious fellowship but the shame that I felt [led] to distancing myself from the church and I was eventually terminated as a member and removed from the church roll call.

4

"The self-hatred [led] to years of self-destructive behavior that further fueled my emotional issues. By the time I reached the age of 23, I had been hospitalized eight times for intending to end my life. I didn't want to live anymore. I did not want to live anymore because I believed that I was a worthless person who did not deserve life. There's still many days that I go to sleep and hope that I won't wake up the following morning because I don't want to spend another day hating myself but everyday gets a little bit easier as I continue to participate in therapy and support groups to work through the trauma.

"I have spent thousands of dollars on therapy, medications and hospitalizations. My sister and mother have entered therapy as well as a result of my downward spiral and attempts to end my life. I have been unable to maintain a full-time job or finish my undergraduate degree at the University of California Santa Barbara. I have relied completely on the members of my family to provide for me financially during the past two years. My parents have also both had to take leave from their jobs at points in order to monitor me and provide transportation during the points when I was severely depressed.

"I also have physical consequences as a result of the trauma. I have nightmares daily and I also periodically have a physical freeze response during which I'm not able to move for an hour or more. I have daily flashbacks and I am still unable to be around men without extreme anxiety.

"I hope to rebuild my life as I move forward from today. I am working to find trust and faith in other people and acceptance of myself. I no longer want to view myself as a broken person and a victim of the actions of Brent Hogg. However, I do believe that his criminal sentence is fair and I hope that he is able to understand the impact [] his behavior has had on others and myself. I am also grateful that his registration as a sex offender can help prevent him from working with children and young adults in the future. I would not wish the pain that I have endured on anyone else and I pray that he's not able to hurt anyone again."

The court set victim restitution at $83,000, but allowed appellant an opportunity for a further hearing. The court stated that appellant had been convicted of an offense that "was on the lower end of what actually occurred," and that "what I saw up here was a young lady who has been devastated by it . . . ."

Appellant's counsel requested a further hearing on restitution. He argued that the victim's claims were "grossly disproportionate to the conduct of defendant" and included matters unrelated to the offense.

In support of the restitution claim, the prosecution submitted a letter dated April 2, 2012, from psychologist Suzanne Johnson, Ph.D. Dr. Johnson stated that she provided outpatient individual therapy to the victim in October and November 2010 prior to her being admitted to inpatient psychiatric care. Dr. Johnson stated that "[a] large portion of our work focused on helping [Jane Doe] try to manage the significant symptoms that arose in relation to the crime committed by Brent Hogg. Based on my clinical evaluation and sessions with [Jane Doe], it is my belief that she would not have needed the extensive mental health care that she received in the absence of the heinous crime perpetrated by Mr. Hogg."

The prosecution also submitted a letter dated April 3, 2012, from Joan M. Striebel, M.D., of UCLA. Dr. Striebel stated that Jane Doe came to her outpatient psychiatric clinic in July 2011 seeking help with depression and anxiety. Dr. Striebel concluded that Jane Doe was "suffering from severe and chronic Post Traumatic Stress Disorder resulting from a sexual assault (DSM-IV TR diagnosis, ICD-9 309.81). Her symptoms are refractory, profoundly impairing, and have required a hospitalization at UCLA as well as intensive outpatient treatment. I have noticed a clear temporal relationship between legal proceedings and the worsening of her symptoms."

Appellant submitted pages printed from online blog entries by Jane Doe describing her struggles with alcohol, weight issues, and " '5 traumas' " that were not specifically identified. In briefing to the court, appellant argued lack of a causal relationship between appellant's "comparatively minor conduct" and the victim's

6

restitution demand. Appellant also argued that he needed the victim's medical records in order to defend the claim.

At the April 13, 2012, restitution hearing, defense counsel argued that, without the medical records, there was no way to determine what role appellant's conduct played in the victim's need for treatment. Defense counsel also noted that the document from the Anthem website with dates, providers, and amounts contained no explanation or detail. The trial court denied defense counsel's request to subpoena Jane Doe's mental health records, but asked that the prosecutor submit to the court letters from the providers "stating why the victim, Jane Doe, was treated and what services they provided."

The continued hearing took place on May 25, 2012. The prosecution established that the Victim Compensation Board had paid $346.50; appellant's counsel acknowledged that this amount was owed by appellant pursuant to statute.[3] In addition, the court stated that it had received documents from Suzanne Johnson, Ph.D., Patricia Daza, Ph.D., Segundo Ibarra, M.D., and J.W.

In a letter dated April 23, 2012, Dr. Johnson stated that "[t]he abuse perpetrated by Mr. Hogg and the symptoms she experienced as a result, was a significant portion of what we worked on during this course of treatment." Dr. Johnson acknowledged that insurers had paid for the treatment she provided, which amounted to approximately $1,200 of the over $82,000 sought.

Patricia Daza, Ph.D., Director of Clinical Training and Psychotherapy Services at the Menninger Clinic, e-mailed the prosecutor on May 4, 2012, stating that she had found the following statement in Jane Doe's psychosocial assessment: "The precipitating event following the most recent series of hospitalizations reportedly had to [do] with the stress surrounding a CPS investigation of her former youth minister for sexually assaulting her when she was an adolescent. A case was opened on this individual after the patient

---

[3] Penal Code section 1202.4, subdivision (f)(4)(A)-(C), creates a rebuttable presumption that moneys paid out of the Victim Compensation Board are a direct result of the defendant's criminal conduct and shall be included in the amount of restitution ordered.

7

reported the abuse to a case worker during one of her recent hospitalizations." There was no information regarding who wrote the entry, when it was written, or the source of the information.

The four-page psychiatric discharge summary from the Menninger Clinic, prepared by Segundo Ibarra, M.D., indicated that Jane Doe was admitted to inpatient care on November 24, 2010, and discharged on January 19, 2011. She was admitted with DSM-IV Axis I diagnoses of anxiety disorder NOS; major depressive disorder, recurrent and severe without psychotic features; bulimia nervosa; and attention deficit hyperactivity disorder NOS; and an Axis II diagnosis of borderline personality disorder. "She was claiming that she was 'stuck in a rut' and was feeling like [she] cannot get out. She was to be admitted . . . for crisis stabilization and substance abuse treatment."

The discharge summary mentions a psychosocial assessment done by Nick Kalko, Ph.D. Jane Doe "reported a significant trauma history and multiple victimization experiences (of being sexually abused)." She also reported a "childhood history of not having been believed or validated." At the time of discharge, she was "deemed to be stable and improved." A diagnostic assessment at discharge indicated Axis I diagnoses of major depressive disorder, recurrent and severe without psychotic features; eating disorder NOS; and alcohol dependence; and an Axis II diagnosis of personality disorder NOS with borderline traits.

The court also received a letter from Jane Doe's close high school friend, J.W. In the letter, J.W. states that during their junior or senior year of high school, Jane Doe told her about an incident involving a co-worker at Target in which Jane Doe stated she believed she was drugged and raped at the co-worker's house.

Defense counsel argued the evidence showed that Jane Doe had experienced additional traumas after appellant's conduct, and none of the documentation submitted by the prosecution showed a causal relationship between Jane Doe's hospitalizations and appellant's conduct. The prosecutor acknowledged that Jane Doe had suffered multiple traumas, but argued that appellant's conduct "made her susceptible to other violations subsequent." Before the matter was submitted, appellant's counsel added that if the court

8

found that the burden of proof had shifted to appellant, he "would request the court's assistance in getting the evidence, which is the issue we've discussed in the past." The court took the matter under submission to review the documentation provided by the parties.

On June 1, 2012, the court issued a written decision in which it noted that the victim had submitted a request for $82,949.09 in restitution. The court acknowledged appellant's arguments regarding causation, but cited authority that multiple causes can combine to cause an injury and that California courts have adopted the substantial factor test to determine whether a defendant's conduct was the proximate cause of the victim's losses.

The court found that the evidence supported the conclusion that appellant's conduct was a concurrent and substantial factor in causing the victim's harm. The court cited the e-mail message from Patricia Daza of the Menninger Clinic, which specifically identified " 'the CPS investigation of [the victim's] former youth minister for sexually assaulting her when she was an adolescent.' " The claims list from Anthem noted that the victim incurred three separate charges totaling $80,600 from the Menninger Clinic for treatment between November 2010 and January 2011. The court found the evidence demonstrated that appellant's actions "played more than a negligible or theoretical role in causing the victim's psychological injuries;" rather, "[t]hey were a substantial factor in causing them and the consequential economic loss of $80,600."

The court also found sufficient evidence to support the claims for $298.30 in services provided by Suzanne Johnson, Ph.D., and $40 in connection with a treatment plan developed by UCLA Health Systems. The Victim Compensation Board submitted a claim for $346.50 that had been paid for the victim's mental health services. Based on the prosecution's concession that this amount would be duplicative of the claims made by the victim, the trial court deducted this amount from the total restitution ordered for mental health services.

The court disallowed $2,010.79 in other mental health charges because of insufficient documentation and $121.40 in travel expenses because the dates of travel

9

indicated on the receipts could not be reconciled with court dates. The victim failed to sustain her burden of showing an adequate factual basis for those expenses.

Accordingly, the court ordered restitution in the amounts of $80,591.80 to the victim and $346.50 to the Victim Compensation Board.[4]

## III. DISCUSSION

The issue of causation lies at the heart of this appeal. Appellant raises various arguments that the restitution order is unlawful because he was prevented from obtaining the victim's mental health records that might shed more light on why the victim sought treatment, specifically, whether and to what extent appellant's criminal conduct caused her need for the treatment for which she sought restitution. The matter of causation is complicated by not only the passage of time since the conduct occurred, but also the victim's history of mental health treatment and other traumatic experiences. Moreover, we are dealing here with psychic injury as opposed to forms of loss such as physical injury, loss of income, or destruction of property, all of which tend to pose more straightforward challenges in terms of the timing, valuation, and causation of the economic loss. However, as we shall explain, none of the circumstances in this case prevented the trial court from applying the law to the evidence and making a well-supported restitution order without obtaining the victim's mental health treatment records.

A.     *Legal Principles.*

Victim restitution for economic loss suffered as a result of criminal activity is constitutionally and statutorily mandated in California. (Cal. Const., art. 1, § 28 ["The Victims' Bill of Rights"]; see also Pen. Code, § 1202.4, subds. (a), (f).) "Article I, section 28, subdivision (b)(13)(A)-C) provides victims the right to restitution from criminal defendants. It states: '(A) It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes

_____

[4] Appellant does not challenge the award to the Victim Compensation Board.

causing the losses they suffer. [¶] (B) Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss. [¶] (C) All monetary payments, monies, and property collected from any person who has been ordered to make restitution shall be first applied to pay the amounts ordered as restitution to the victim.' " (*People v. Smith* (2011) 198 Cal.App.4th 415, 431 (*Smith*).)

"Implementing article I, section 28, subdivision (b)(13), Penal Code section 1202.4, subdivision (f) requires the trial court to order the defendant to pay restitution to the victim 'in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court.' " (*Smith*, *supra*, 198 Cal.App.4th at p. 431.) A victim restitution order "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as a result of the defendant's criminal conduct," including medical expenses and mental health counseling expenses. (§ 1202.4, subd. (f)(3).) Victim restitution in full is mandatory, absent compelling and extraordinary reasons. (§ 1202.4, subds. (f), (g).) "A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution order, nor shall inability to pay be a consideration in determining the amount of a restitution order." (§ 1202.4, subd. (g).)

" 'The standard of review of a restitution order is abuse of discretion. "A victim's restitution right is to be broadly and liberally construed." [Citation.] " 'Where there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.' " [Citations.]' (*In re Johnny M*. (2002) 100 Cal.App.4th 1128, 1132.) However, a restitution order 'resting upon a " 'demonstrable error of law' " constitutes an abuse of the court's discretion. [Citations.]' (*People v. Jennings* (2005) 128 Cal.App.4th 42, 49.) 'In reviewing the sufficiency of the evidence [to support a factual finding], the " 'power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings." [Citations.] Further, the standard of proof at a restitution hearing is by a preponderance

11

of the evidence, not proof beyond a reasonable doubt. [Citation.] "If the circumstances reasonably justify the [trial court's] findings," the judgment may not be overturned when the circumstances might also reasonably support a contrary finding. [Citation.] We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact. [Citations.]' (*People v. Baker* [(2005)] 126 Cal.App.4th [463,] 468-469.)" (*People v. Millard* (2009) 175 Cal.App.4th 7, 26 (*Millard*); see also *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1173 (*Chappelone*) [review trial court's restitution order for abuse of discretion].)

A defendant is entitled to a hearing to "dispute the determination of the amount of restitution." (§ 1202.4, subd. (f)(1).) At a victim restitution hearing, the People are required to make out a prima facie showing of economic loss. (*Millard*, *supra*, 175 Cal.App.4th at p. 26.) The burden then shifts to the defendant to rebut the showing. (*People v. Fulton* (2003) 109 Cal.App.4th 876, 886.) The trial court has broad discretion to choose a method for calculating the amount of restitution, but it must employ a method that is rationally designed to determine the victim's economic loss. (*People v. Giordano* (2007) 42 Cal.4th 644, 663-664 (*Giordano*).) " 'There is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action. [Citation.]' (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1121.)" (*Millard*, *supra*, 175 Cal.App.4th at pp. 26-27.)

B.     *Appellant Has No Due Process Right to the Victim's Mental Health Records.*

Appellant contends that the trial court's ruling denying him access to the victim's mental health records violated his due process rights because he was unable to cross-examine witnesses and present evidence in his defense. A process without these elemental protections, he argues, creates a risk of an erroneous decision in a situation such as this, where years passed between the criminal offense and the claimed economic losses, and the restitution amount is large relative to the severity of the misconduct. Moreover, he asserts, allowing him to review the victim's mental health records would

not burden the government or the victim since the victim testified at the original sentencing hearing. These arguments are not persuasive.

In *Giordano, supra,* 42 Cal.4th at p. 662, fn. 6, the California Supreme Court noted that "numerous courts have held that restitution hearings require fewer due process protections than civil hearings or criminal hearings of guilt. [Citations.] Courts have premised this conclusion on the understanding that restitution hearings are sentencing hearings. [Citations.]" Thus, it is well established that " '[t]he scope of a criminal defendant's due process rights at a hearing to determine the amount of restitution is very limited: " ' " 'A defendant's due process rights are protected when [he has] notice of the amount of restitution claimed . . ., and . . . has an opportunity to challenge the figures . . . at the sentencing hearing.' " ' " [Citations.]' [Citations.]" (*People v. Prosser* (2007) 157 Cal.App.4th 682, 692.) A victim's right to restitution is broadly construed and the court has discretion when determining the formalities to be followed and the evidence to be considered. (*Millard, supra,* 175 Cal.App.4th at p. 42.) Generally, a "trial court violates the defendant's due process right at a hearing to determine the amount of restitution [only when] the hearing procedures are fundamentally unfair. [Citation.]" (*People v. Cain* (2000) 82 Cal.App.4th 81, 87 (*Cain*).)

Here, appellant received notice of the amount of restitution claimed at the sentencing hearing; he sought, and was granted, a subsequent hearing on the issue of restitution. At the restitution hearing, appellant had the opportunity to contest the restitution claim, and he exercised that opportunity. He challenged the victim's claim on several grounds, including that the amount was out of proportion to the gravity of the offense, that too much time had elapsed between the offense and the mental health services provided to the victim, and that appellant's offense was not the only cause of the victim's need for mental health services. The court considered the evidence and arguments, and requested additional supporting evidence from the prosecution. At the continued hearing, appellant submitted affirmative evidence that the victim had experienced other traumas before and after appellant's misconduct, specifically, the letter from J.W. and the victim's online blog entries. The prosecution submitted additional

13

evidence, including the discharge summary from the Menninger Clinic which went into some detail regarding the treatment provided to the victim.[5]  Following argument, the court took the matter under submission and subsequently issued its written ruling.

Appellant argues that a restitution order is akin to a civil jury award of economic damages and that he should, therefore, be entitled to at least the same protections and requirements as a defendant in a civil proceeding, including that the victim would have to waive the psychotherapist-patient privilege.  We disagree.  Although the restitution order and a civil jury award both result in an enforceable judgment, a restitution hearing is a criminal sentencing hearing, not a civil trial.  (See *People v. Smith*, *supra*, 198 Cal.App.4th at p. 434.)  A criminal defendant does not have a Sixth Amendment right to confrontation during a restitution hearing.  (*Cain*, *supra*, 82 Cal.App.4th at pp. 86-87.)  Appellant was not entitled to confront and cross-examine witnesses.  Moreover, a restitution order is not a civil judgment; it does not resolve civil liability.  (*Vigilant Ins. Co. v. Chiu* (2009) 175 Cal.App.4th 438, 444-445.)  "A restitution order reimburses only for economic losses [citation], not noneconomic losses,[6] which can be recoverable in a civil judgment."  (*Id.* at p. 445.)  A civil judgment also does not vindicate the state's

---

[5] At oral argument, the Attorney General advised us that, upon close review of the discharge summary, his office realized that this document refers to services provided to the victim that may not have been related to appellant's criminal conduct, specifically references to an x-ray, MRI, and physical therapy.  Appellant responded that this concession supports his position that he should have been allowed to subpoena medical records.  We disagree.  The discharge summary was provided to appellant.  In fact, his counsel quoted from it at the hearing.  Having raised no argument below that the cost for these services should be excluded from the restitution calculation, appellant has forfeited the contention.  (See *People v. McCullough* (2013) 56 Cal.4th 589, 591, 594, 599 [no review of asserted factual error in sentencing for the first time on appeal]; *People v. Scott* (1994) 9 Cal.4th 331, 355 [fact-specific errors not susceptible of correction on appeal]; *People v. Garcia* (2010) 185 Cal.App.4th 1203, 1218 [defendant forfeited challenge to restitution award of expert witness fee by failing to object].)

[6] We note the exception that victim restitution for "[n]oneconomic losses, including, but not limited to, psychological harm," is expressly authorized for felony violations of section 288.  (§ 1202.4, subd. (f)(3)(F).)  Section 288 prohibits lewd and lascivious acts upon a minor.  Prior to the plea bargain, the information in this matter charged appellant with two felony counts of violating section 288, subdivision (c)(1).

interest in restitution, which is to rehabilitate the offender and deter future criminal activity. (*Ibid.*)

Appellant also contends that the trial court should have conducted an in camera review of the victim's mental health records. The contention has no merit. First, appellant did not make this request in the trial court. His arguments below were entirely focused on obtaining the records for his own review to challenge causation. Second, the trial court's order was supported by substantial evidence. (See part III.H., *post*.) Third, it is unclear whether the trial court was even authorized to obtain and review the victim's mental health records under these circumstances, and we express no opinion on this issue. (See Cal. Const., art. I, § 28.) Finally, the cases appellant cites all concern the in camera review of privileged documents in criminal pre-trial or trial proceedings, not post-trial sentencing proceedings. (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39; *People v. Abel* (2012) 53 Cal.4th 891; *People v. Hammon* (1997) 15 Cal.4th 1117.)

Lastly, appellant's contention that providing him with the victim's mental health records would not further victimize her by invading her privacy because she testified at the sentencing hearing is simply a non sequitur. Clearly, the Victims' Bill of Rights, enshrined as the law and public policy of the state of California, is to the contrary.

Appellant has not cited any authority holding that, in the context of a restitution hearing, the defendant has a constitutional due process right to obtain the victim's confidential mental health records. The trial court's refusal to allow appellant access to the victim's mental health records did not deprive appellant of a meaningful opportunity to present evidence at the restitution hearing or to vigorously defend himself, nor did it render the restitution hearing fundamentally unfair. Thus, the ruling did not constitute a violation of appellant's due process rights. (*Cain*, *supra*, 82 Cal.App.4th at p. 87.)

C.  *The California Constitutional Provision Restricting Disclosure of Confidential Records Does Not Violate Due Process or Equal Protection.*

"Proposition 9, the 'Victims' Bill of Rights Act of 2008: Marsy's Law,' . . . amended the California Constitution to guarantee crime victims a number of rights, including the right '[t]o prevent the disclosure of confidential information or records to

15

the defendant, the defendant's attorney, or any other person acting on behalf of the defendant, which could be used to locate or harass the victim or the victim's family or which disclose confidential communications made in the course of medical or counseling treatment, or which are otherwise privileged or confidential by law.' (Cal. Const., art. I, § 28, subd. (b)(4).) Marsy's Law provides that this right, along with the others enumerated in subdivision (b), may be enforced by '[a] victim, the retained attorney of a victim, a lawful representative of the victim, or the prosecuting attorney upon request of the victim.' (*Id*., art. I, § 28, subd. (c)(1).)" (*Kling v. Superior Court* (2010) 50 Cal.4th 1068, 1080.)

Appellant contends that this provision is void on its face and as applied in this case because it violates both due process and equal protection under the federal Constitution. According to appellant, this provision completely bars the defense from obtaining and producing evidence of a victim's medical and counseling records, regardless of their relevance or the amount of good cause, which is not only unfair, but also is contrary to the California Constitution's Right to Truth-in-Evidence provision.[7]

Appellant's argument that this provision violates the equal protection clauses of the state and federal constitutions has no merit. "The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) Accordingly, ' "[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more

---

[7] "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press." (Cal. Const., art. 1, § 28, subd. (f)(2).)

16

*similarly* situated groups in an unequal manner." ' (*Ibid*.)" (*People v. Brown* (2012) 54 Cal.4th 314, 328.)

Appellant's equal protection theory, that Marsy's Law results in disparate treatment of civil and criminal defendants from whom a victim claims the costs of therapy, does not pass muster. First, civil and criminal defendants are not similarly situated, regardless of the source of the economic harm. Second, we see no indication that Marsy's Law would function differently in a civil, as opposed to a criminal, context. The privilege against disclosure of mental health records applies to all victims of crime and all convicted defendant*s*, and crime victims retain the right to waive the law's protections. Notwithstanding the Victims' Bill of Rights, crime victims seeking to recover for economic loss, whether by restitution award or civil judgment, must sustain their respective burdens of production and proof.

Appellant's due process argument fares no better. We have already addressed appellant's contentions that the trial court's refusal to allow him access to the victim's mental health records violated his due process rights. (See part III.B., *ante*.)

In support of his contention that the provision is unconstitutional on its face, appellant relies on *California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 347 (*CTA*). In *CTA*, the California Supreme Court considered a facial due process challenge to a statute that required a teacher who requested a hearing regarding a suspension or termination, but was ultimately unsuccessful, to pay one-half of the cost of the administrative hearing. The court found the statute facially invalid because it was an exception to the general rule that unsuccessful litigants do not pay the cost of administrative hearings, it impermissibly chilled the teachers' exercise of their due process right to a hearing, and it could not be justified as deterring frivolous litigation. (*Id*. at pp. 339-342.)

Following the analysis in *CTA*, appellant balances a defendant's interest in his or her property, the state's interest in expediency and avoidance of fiscal and administrative burden, and the risk of an erroneous decision, and concludes, not surprisingly, that the state's interests must yield to a defendant's interest in his or her assets. However,

17

appellant's assignment of expediency and savings of time and money as the state's interests in the Marsy's Law provision misses the mark. The Victims' Bill of Rights expressly provides that "[c]riminal activity has a serious impact on the citizens of California. The rights of victims of crime and their families in criminal prosecutions are a subject of grave statewide concern. [¶] Victims of crime are entitled to have the criminal justice system view criminal acts as serious threats to the safety and welfare of the people of California. The enactment of comprehensive provisions and laws ensuring a bill of rights for victims of crime, including safeguards in the criminal justice system fully protecting those rights and ensuring that crime victims are treated with respect and dignity, is a matter of high public importance. . . ." (Cal. Const., art. I, § 28, subd. (a)(1-2)).)

Moreover, unlike the teachers in *CTA* whose due process right to a hearing was impaired by the statute, here, the prospect of being unable to view a victim's medical or mental health records will not hinder a defendant from requesting a restitution hearing or contesting a restitution claim. The court must still evaluate the evidence to determine whether the offense the defendant committed caused or substantially contributed to the condition requiring treatment. Here, the prosecution provided evidence to the court's satisfaction that appellant's misconduct caused or was a substantial factor in causing the victim to need the mental health treatment for which restitution was sought.

The privilege against disclosure that exists here is a function of statutory law as well as constitutional law. Appellant has not argued that the California statutes that permit a sexual assault victim to assert a privilege for mental health treatment records (Evid. Code, §§ 1014, 1035.8) are unconstitutional. Appellant does, however, contrast the Marsy's Law provision with Evidence Code section 1103 (section 1103), which was amended in 1974 to exclude evidence of a victim's sexual history with persons other than the defendant when offered to prove consent in a prosecution for rape or a related crime. (*People v. Blackburn* (1976) 56 Cal.App.3d 685, 690 (*Blackburn*).) As appellant points out, the statute was deemed constitutional because the relevance of the excluded evidence was slight at best and the defendant could introduce evidence of the victim's sexual

18

conduct or cross-examine the victim regarding such conduct to attack the victim's credibility. (*Blackburn*, *supra*, 56 Cal.App.3d at p. 691.)

The comparison with *Blackburn* does not assist appellant. Section 1103 limits the admissibility of certain evidence in very specific criminal trial circumstances, while the Marsy's Law provision applies to ensure that the personal details of a victim's mental health treatment will not fall into the hands of the perpetrator.

Finally, appellant argues that, to the extent that Marsy's Law creates an absolute bar on disclosure, it is unconstitutional, but that it could instead be interpreted to incorporate the law of existing privilege, including the concept of waiver, and thereby avoid an unconstitutional construction. However, we need not consider this argument because, regardless of Marsy's Law, appellant's due process rights were not violated by the trial court's refusal to subpoena the victim's records. (See part III.B., *ante*.)

D.  *Appellant Was Not Denied a Fair and Impartial Judge in Violation of Due Process*.

Appellant argues that the trial judge was not fair and impartial but rather had a preconceived position regarding the amount of restitution appellant would be required to pay. He bases this contention on the court's refusal to allow the victim's records to be subpoenaed and statements by the court at the April 13, 2012, restitution hearing in which the court initially indicated that it had enough information to make a decision on restitution, but subsequently requested additional evidence from the prosecution in support of the claim.

The first comment with which appellant takes issue occurred shortly after the hearing commenced, following a discussion off the record:

"THE COURT: Back on the record in *People v. Hogg*. I have reviewed the documents provided by both defense counsel and the People; and we discussed Mr. Daley's [defense counsel] request to be allowed to subpoena the actual mental health records of the victim and I am declining to do so. [¶] I believe that I have sufficient information before me—although Mr. Mahalich [the prosecutor], the letter I have from Dr. Striebel is very close, covers quite a bit of the information I was seeking. If you can

19

provide for me either orally or somehow from the victim that these services were sought specifically stemming from the sexual assault, and that's what it was for. [¶] In essence that's what Dr. Striebel says; but she doesn't state all $83,000 worth of those visits—that every visit stemmed from that issue. And that's what I would like to have specifically clarified."

Subsequently, following argument by the parties, and immediately following defense counsel's argument that the Anthem document submitted by the prosecution provided no detail or explanation of the services provided:

"THE COURT: I give you that, Mr. Daley. Now I have a couple of comments. First, in response to a few things you said. Mr. Mahalich touched on this; but when you say the [defendant] cannot be blamed for the stress or trauma that the victim goes through, like facing a trial. She wouldn't have been there dealing with the trial but for the underlying act. So I am in disagreement there. [¶] Moreover, a delayed processing of trauma is very common in sexual assault cases. Very often women or children think they're just fine and years later things come up and they start to address it, frequently when the psyche is ready to address it. [¶] I believe there is some actual proof here. But I have a rather broad letter written that Mr. Mahalich just gave me; and very specifically I believe a letter from [the providers] should be submitted to the Court stating why the victim, Jane Doe, was treated and what services they provided. [¶] So because there is nothing in there and those are as Mr. Daley points out the major portion of the restitution that's being sought, could you get that to me in a few weeks perhaps?"

Thus, although the court declined to allow appellant to subpoena the victim's mental health records, in light of evidence that the victim had experienced other traumas and that other matters may have contributed to her need for treatment, and in response to counsel's argument about the lack of explanation or detail in the restitution claim, the court requested additional documentation from the prosecutor. At the next hearing, the court stated that it had received additional information and described those documents. The court then allowed the parties to present argument before taking the matter under submission.

20

Appellant argues that "the trial judge in refusing defense counsel's request to obtain records established her bias when she indicated she had sufficient evidence before her, but then requested the prosecution to produce more evidence to confirm her conclusion." Appellant contends he presented sufficient good cause for at least an in camera review of the victim's mental health records, and that the court's denial demonstrated bias. The contention has no merit.

First, appellant's counsel neither objected to the trial court's request for additional documentation in support of the restitution claim nor raised any claim of bias in that court. Appellant cites the California statute by which a party may seek to disqualify a trial judge, Code of Civil Procedure section 170.1, but appellant did not move to disqualify at the trial court level and a claim of statutory disqualification cannot be raised for the first time on appeal. (See *People v. Brown* (1993) 6 Cal.4th 322, 333.) Thus, any claim of statutory disqualification has been waived or forfeited.

Second, appellant's argument that these comments by the trial court demonstrate bias against appellant is speculative at best. The People have the burden to make out a prima facie showing for restitution. (See *Millard*, *supra*, 175 Cal.App.4th at p. 26.) At the sentencing hearing, both the victim and her mother spoke about the ongoing psychological harm the victim suffered as a result of appellant's actions. The victim explained the effects the inappropriate sexual activity had on her at the time and during subsequent teen and young adult years. From the court's comments, it is apparent that the court found the victim to be credible and articulate in describing the devastating impact of appellant's misconduct. It also appears that the court's request for additional information from the prosecution was in direct response to, and express acknowledgement of, defense counsel's contentions regarding the lack of explanation or detail in the documentation supporting the restitution claim.

On this record, we discern no basis for a claim that the trial court judge was not fair and impartial.

21

E.   *The Court's Refusal to Allow Appellant to Obtain the Victim's Medical Records Did Not Constitute an Abuse of Discretion.*

Next, appellant contends that the trial court had discretion to order disclosure of Jane Doe's mental health records and abused that discretion by refusing to do so. Appellant relies on *People v. Gaines* (2009) 46 Cal.4th 172 (*Gaines*), which involved the erroneous denial of a defendant's *Pitchess* motion (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).)  The argument does not further appellant's cause.

A *Pitchess* motion is not analogous to appellant's attempt to access the victim's mental health treatment records.  The *Gaines* court described the procedure to be followed when a criminal defendant seeks information from a peace officer's personnel file:  "[O]n a showing of good cause, a criminal defendant is entitled to discovery of relevant documents or information in the confidential personnel records of a peace officer accused of misconduct against the defendant.  (Evid. Code, § 1043, subd. (b).)  Good cause for discovery exists when the defendant shows both ' "materiality" to the subject matter of the pending litigation and a "reasonable belief" that the agency has the type of information sought.'  (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 84.)  A showing of good cause is measured by 'relatively relaxed standards' that serve to 'insure the production' for trial court review of 'all potentially relevant documents.'  (*Ibid.*)  If the defendant establishes good cause, the court must review the requested records in camera to determine what information, if any, should be disclosed.  (*Chambers v. Superior Court* (2007) 42 Cal.4th 673, 679.)  Subject to certain statutory exceptions and limitations [citation], 'the trial court should then disclose to the defendant "such information [as] is relevant to the subject matter involved in the litigation." '  (*People v. Mooc* (2001) 26 Cal.4th 1216, 1226, quoting Evid. Code, § 1045, subd. (a) . . . .)"  (*People v. Gaines*, *supra*, 46 Cal.4th at p. 179.)

By contrast, the privilege against disclosure at issue here is constitutional and arguably absolute.  (See *People v. Dancer* (1996) 45 Cal.App.4th 1677, 1692, fn. 8, disapproved on other grounds in *People v. Hammon, supra,* 15 Cal.4th at p. 1123.) Appellant did not request an in camera review of the victim's records; he sought

disclosure in order to contest the restitution amount. Unlike materials sought by way of a *Pitchess* motion, here, the records appellant sought were not relevant to a determination of his guilt or innocence; their only relevance was to the extent to which appellant's misconduct caused the victim to need the treatment for which she sought compensation. The record contained other evidence establishing that causal connection, and the trial court did not abuse its discretion, assuming it had such, in declining to order production of those records.

F.     *Appellant Had No Right to a Jury Trial or the Beyond A Reasonable Doubt Standard of Proof.*

Appellant contends the trial court erred in not affording him a jury trial on the issue of victim restitution and in not basing the restitution order on facts that were established beyond a reasonable doubt. He argues that restitution awards constitute punishment, thus triggering the right to trial by jury and proof beyond a reasonable doubt, and relies for this proposition on *People v. Brown* (2007) 147 Cal.App.4th 1213 (*Brown*). In *Brown*, our colleagues in Division Three of this court considered whether the defendant had the right to withdraw her guilty plea when the plea agreement limited her restitution payments to the victim's out-of-pocket expenses of $280, with no payments to the Victim Compensation Board as required by law. (*Id*. at p. 1218.) The Board then requested over $34,000 in restitution for the victim's medical expenses, and the trial court ordered that it be paid. (*Id*. at p. 1219.) The Court of Appeal held that, under these circumstances, the defendant should have been allowed to withdraw her plea. The imposition of such a substantial restitution award operated as additional punishment, and the deviation from the plea agreement was significant. (*Id*. at p. 1224.)

*Brown* does not assist appellant. Here, there was no agreement regarding the amount of restitution, nor does appellant seek to withdraw his plea. *Brown* does not address the Sixth Amendment right to a jury trial, nor have we found any case that extends *Brown* to that context. In any event, in *Chappelone, supra,* 183 Cal.App.4th 1159, we rejected the same argument appellant makes here, that the restitution order violated the defendants' Sixth Amendment jury trial rights because the order constituted

23

increased punishment. As appellant argues here, the argument in *Chappelone* was based on *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), and its progeny, particularly *Cunningham v. California* (2007) 549 U.S. 270, in which the United States Supreme Court held that a defendant has a Sixth Amendment right to a jury trial as to any fact that increases the penalty for a crime. (*Chappelone* at pp. 1183-1184.) We observed that the California Supreme Court had not yet weighed in on the question of whether a restitution hearing must be tried to a jury, but that two California appellate decisions and various federal courts had all rejected the argument. (*Id.* at p. 1184, and cases cited therein; see also *Millard*, *supra*, 175 Cal.App.4th at p. 35 [no Sixth Amendment right to jury trial or due process right to proof beyond a reasonable doubt at victim restitution hearing; primary purpose of restitution is an expedited civil remedy for victim's losses, not criminal punishment]; *People v. Harvest* (2000) 84 Cal.App.4th 641, 649 (*Harvest*) [victim restitution, unlike a restitution fine, does not constitute punishment for purposes of double jeopardy].)

Appellant cites *Southern Union Co. v. United States* (2012) 132 S.Ct. 2344 (*Southern Union*), in which the United States Supreme Court struck down a fine in excess of the amount authorized by facts found by a jury, as further support for his claim that he was entitled to Sixth Amendment protections at the restitution hearing. However, our colleagues in the Fourth District in *People v. Pangan* (2013) 213 Cal.App.4th 574, 585 (*Pangan*), recently rejected the argument that *Southern Union* and the *Apprendi* line of cases apply to victim restitution hearings. The *Pangan* court explained: "*Southern Union* involved a restitution fine of $50,000 *a day* for each day of a putative 762-day long environmental law violation. The United States Supreme Court struck the fine down because the very fact which determined the 'maximum fine' the corporate defendant faced—the number of days the violation continued—was not determined by the jury. [Citation.]

"*Apprendi* held that any fact which increases a defendant's sentence beyond the 'statutory maximum' must go to the jury. [Citation.] And *Blakely* [*v. Washington* (2004) 542 U.S. 296 (*Blakely*)] was a gloss on *Apprendi*, holding that the statutory maximum

24

under *Apprendi* was the maximum sentence a judge could impose based on facts reflected in the jury verdict or admitted by the defendant. [Citation.]

"But neither *Southern Union*, *Apprendi* nor *Blakely* have any application to direct victim restitution, because direct victim restitution is not a criminal penalty. As explained in *United States v. Behrman* (7th Cir. 2000) 235 F.3d 1049, 1054, direct victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits. It is not increased 'punishment.' The *Millard* decision makes the same point in regard to California law. [Citations.] *Chappelone* has collected the numerous federal cases also holding victim restitution does not constitute increased punishment for crime. [Citation.] And we would note the restitution statute *itself* characterizes victim restitution awards as civil. (See § 1202.4, subd. (a)(3)(B) [victim restitution 'shall be enforceable as if the order were a civil judgment'].)

"Federal courts have also rejected *Apprendi* challenges to victim restitution statutes because those statutes, like the one before us, carry no prescribed statutory maximum. [Citations.]" (*Pangan*, *supra*, 213 Cal.App.4th at p. 585.)

Applying the federal restitution statute, the Fourth Circuit recently reached the same conclusion in *United States v. Day* (4th Cir. 2012) 700 F.3d 713 (*Day*). The defendant argued that the trial court's imposition of a restitution award in excess of $6 million violated *Apprendi* because the jury did not find facts giving rise to that amount. (*Day*, *supra*, 700 F.3d at p. 732.) The court stated: "Day's restitution argument is unavailing, although for a different reason than that which supports the imposition of his fine. For unlike that challenge, which is encompassed by *Southern Union*'s holding that '*Apprendi* applies to the imposition of criminal fines,' (132 S.Ct. at 2357), there is the initial question in the restitution context of whether *Apprendi* applies at all. Prior to *Southern Union*, every circuit to consider whether *Apprendi* applies to restitution held that it did not. (See *United States v. Milkiewicz*, 470 F.3d 390, 403 (1st Cir. 2006) ('[L]ike all of the other circuits to consider this question, we conclude that [*Apprendi* does] not bar judges from finding the facts necessary to impose a restitution order.').)

25

Day argues that we should break ranks with these prior decisions in light of *Southern Union* and apply *Apprendi* to restitution because it is 'similar' to a criminal fine.

"We decline to take Day's suggested course. As an initial matter, we note that *Southern Union* does not discuss restitution, let alone hold that *Apprendi* should apply to it. Instead, far from demanding a change in tack, the logic of *Southern Union* actually reinforces the correctness of the uniform rule adopted in the federal courts to date. That is, *Southern Union* makes clear that *Apprendi* requires a jury determination regarding any fact that 'increases the penalty for a crime beyond the prescribed statutory maximum.' (132 S.Ct. at 2350 (quoting *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348).) Thus, in *Southern Union* itself, the *Apprendi* issue was triggered by the fact that the district court imposed a fine in excess of the statutory maximum that applied in that case. (*Id*. at 2349.)

"Critically, however, there is no *prescribed statutory maximum* in the restitution context; the amount of restitution that a court may order is instead indeterminate and varies based on the amount of damage and injury caused by the offense. (See 18 U.S.C. §§ 3663(b), 3663A(b).) As a consequence, the rule of *Apprendi* is simply not implicated to begin with by a trial court's entry of restitution. As the Sixth Circuit aptly explained in *United States v. Sosebee*, 'restitution is not subject to [*Apprendi*] because the statutes authorizing restitution, unlike ordinary penalty statutes, do not provide a determinate statutory maximum.' (419 F.3d 451, 454 (6th Cir.), cert denied, 546 U.S. 1082.) That logic was sound when written before *Southern Union*, and it remains so today." (*Day*, *supra*, 700 F.3d at p. 732.)[8]

Appellant argues alternatively that, to the extent the restitution award is civil in nature, he was entitled to a jury trial under the Seventh Amendment which preserves the right to a jury trial in a civil action where the amount in controversy exceeds $20. However, as appellant acknowledges, no court has adopted this analysis and the Ninth

---

[8] The United States Supreme Court denied a petition for certiorari in *Day* on April 29, 2013. (133 S.Ct. 2038.)

26

Circuit has explicitly rejected it. (*United States v. Keith* (9th Cir. 1985) 754 F.2d 1388, 1391-1392 [restitution under the Victim and Witness Protection Act of 1982, 18 U.S.C. §§ 3579, 3580, is a criminal penalty; victim enforcement provision "does not transform a sentencing proceeding resulting in a restitution order into an 'action at common law' within the meaning of the seventh amendment"].) We are similarly unpersuaded that the Seventh Amendment has any application here.

G.      *The Restitution Award Does Not Constitute an Excessive Fine.*

Appellant contends the restitution award violates the excessive fines clause of the Eighth Amendment because it is disproportionate to the crime he committed. The award is excessive, according to appellant, because his offense was a misdemeanor and carried only a maximum punishment of up to one year in county jail and a fine of up to $5,000; the restitution award was over 16 times greater than the maximum fine that could be imposed; and the award creates a hardship for his family. The argument has no merit.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (U.S. Const., 8th Amend.) The right to be free from excessive fines flows from the basic " ' "precept of justice that punishment for crime should be graduated and proportioned" ' to [the] offense." (*Miller v. Alabama* (2012) __ U.S. __ [132 S.Ct. 2455, 2463]; *Roper v. Simmons* (2005) 543 U.S. 551, 560.) "[A]t the time the Constitution was adopted, 'the word "fine" was understood to mean a payment to a sovereign as punishment for some offense.' [Citation.]" (*United States v. Bajakajian* (1998) 524 U.S. 321, 327-328 (*Bajakajian*), superseded on other grounds as explained in *United States v. Jose* (1st Cir.P.R. 2007) 499 F.3d 105, 110.) "The Excessive Fines Clause thus 'limits the government's power to extract payments, whether in cash or in kind, "as punishment for some offense." ' [Citation.]" (*Bajakajian* at p. 328.)

As discussed above, victim restitution, unlike a restitution fine, is not a form of punishment. (*Harvest, supra,* 84 Cal.App.4th at pp. 646-650.) Victim restitution is paid to the victim, not the state, and its purpose is to compensate the victim for economic losses suffered as a result of the crime, not to punish the defendant for an offense.

(*Harvest*, *supra*, 84 Cal.App.4th at p. 649; *Bajakajian*, *supra*, 524 U.S. at pp. 327-328.) Thus, the restitution award is not a fine, and the Eighth Amendment is not implicated.

In arguing that restitution is a form of punishment, appellant cites *United States v. Dubose*, in which the Ninth Circuit held that, under the federal restitution law, victim restitution awards are punishment and may be subject to the excessive fines clause if they are grossly disproportional to the criminal offense. (*United States v. Dubose* (9th Cir. 1998) 146 F.3d 1141, 1144-1145, citing *Bajakajian*, *supra*, 118 S.Ct. at p. 2036.) The *Dubose* court went on to explain, however, that proportionality is inherent in a victim restitution order: " 'Where the amount of restitution is geared directly to the amount of the victim's loss caused by the defendant's illegal activity, proportionality is already built into the order.' " (*Dubose*, *supra*, 146 F.3d at p. 1145.) Furthermore, the hardship a restitution order may have on the defendant is not part of the Eighth Amendment excessive fines inquiry. (*Id*. at p. 1146.)

Thus, even if the Eighth Amendment were applicable, there is no violation of the excessive fines clause. The evidence upon which the trial court relied in ordering restitution shows that the award was directly based on the amount of economic loss caused to the victim by appellant's criminal conduct.

H.     *The Restitution Award Was Not an Abuse of the Court's Discretion*.

Finally, appellant contends the trial court abused its discretion when it set the amount of victim restitution because other incidents before and after appellant's criminal conduct "may have broken the chain of causation for some, if not all of the treatment," and because the trial court did not address "the issue of comparative negligence based on the other conditions that Jane Doe had that required treatment." These arguments have no merit.

"[S]ection 1202.4, subdivision (f)(3) provides that '[t]o the extent possible, the restitution order . . . shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred *as the result of the defendant's criminal conduct*.' (Italics added.) Interpreting the requirement that the damages result from the defendant's criminal conduct, the court in *People v. Jones*

28

(2010) 187 Cal.App.4th 418, 424-427 (*Jones*) held that tort principles of causation apply to victim restitution claims in criminal cases. The court observed that there 'are two aspects of causation . . . cause in fact (also called direct or actual causation), and proximate cause.' (*Id*. at p. 424.) The court explained that ' "[a]n act is a cause in fact if it is a necessary antecedent of an event" ' and that ' "proximate cause 'is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct.' " ' (*Id*. at p. 425.)" (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320-1321 (*Holmberg*).)

" 'The first element of legal cause is *cause in fact* . . . . The "but for" rule has traditionally been applied to determine cause in fact. [¶] The Restatement formula uses the term *substantial factor* "to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause." ' [Citation.] [¶] . . . California courts have adopted the 'substantial factor' test in analyzing proximate cause. (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1050-1053.) ' "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." [Citation.] Thus, "a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor" [citation], but a very minor force that does cause harm is a substantial factor [citation]. This rule honors the principle of comparative fault.' (*Bockrath v. Aldrich Chemical Co*. (1999) 21 Cal.4th 71, 79.)" (*Holmberg*, *supra*, 195 Cal.App.4th at pp. 1321-1322.)

Here, in response to appellant's arguments that his conduct was not the proximate cause of the victim's need for mental health treatment, the prosecution submitted evidence from the providers. Patricia Daza, Director of Clinical Training and Psychotherapy Services of the Menninger Clinic stated in an email that the "precipitating event following the most recent series of hospitalizations reportedly had to [do] with the stress surrounding a CPS investigation of [the victim's] former youth minister for sexually assaulting her when she was an adolescent." The victim incurred charges totaling $80,600 during her treatment at the Menninger Clinic between November 2010

29

and January 2011. We agree with the trial court that this evidence demonstrates that appellant's actions played more than an infinitesimal or theoretical part in bringing about the victim's need for this treatment; rather, the conduct was a substantial factor in causing the harm.

Similarly, a letter from Suzanne Johnson, Ph.D, a licensed psychologist, stated that she treated the victim in outpatient psychotherapy from October 2010 through November 2010. Dr. Johnson stated that "[t]he abuse perpetrated by Mr. Hogg, and the symptoms she [the victim] experienced as a result, was a significant portion of what we worked on during this course of treatment." Joan M. Striebel, M.D., of UCLA Health System, stated in a letter that she began treating the victim in July 2011 for severe and chronic Post Traumatic Stress Disorder resulting from a sexual assault, and that she had "noticed a clear temporal relationship between legal proceedings and the worsening of her symptoms." We again agree with the trial court that these letters support the finding that appellant's misconduct was a substantial factor in causing the losses incurred by the victim: $298.30 in psychological services rendered by Dr. Johnson and $40.00 in connection with a treatment plan developed by UCLA Health Systems in September 2011. This evidence constitutes a " ' "factual and rational basis for the amount of restitution" ' " ordered by the trial court. (*Holmberg*, *supra*, 195 Cal.App.4th at p. 1320.)

Finally, appellant argues that the trial court abused its discretion when it failed to address the issue of comparative negligence "based on the other conditions that Jane Doe had that required treatment." Appellant relies on *Millard, supra,* 175 Cal.App.4th 7 in arguing that principles of comparative fault apply to criminal restitution orders. However, *Millard* involved a motor vehicle accident in which the defendant was driving under the influence and made an illegal turn; the victim was driving too fast, did not have proper training to handle a motorcycle, and took no evasive action to avoid the collision. (*Id*. at p. 37.) In other words, the victim's own negligence was a substantial factor in causing his injuries. (*Id*. at p. 38.) Noting that it was a " 'negligence[-]type crime,' " the trial court concluded that the victim was "25 percent comparatively at fault for the

accident," and reduced the victim's restitution amount accordingly "to reflect his comparative negligence in causing the accident." (*Id*. at p. 24.)

Here, we are not dealing with a " 'negligence[-]type crime.' " (*Millard, supra,* 175 Cal.App.4th at p. 24.) Appellant's conduct in touching the victim's breast was not the result of negligence; it was an intentional act. Furthermore, although in another section of his brief appellant characterizes his crime as, "at worst," involving "inappropriate touching of a willing teenager's breast over a short period of time," we flatly reject any implication that the victim's own negligence played any part in causing her injury. *Millard* is inapposite here.

## IV. DISPOSITION

The judgment is affirmed.

_____
Haerle, Acting P.J.

We concur:

_____
Richman, J.

_____
Brick, J.*

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

31