**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4277**

UNITED STATES OF AMERICA,

    Plaintiff – Appellee,

v.

VAXIMA, INC.,

    Defendant – Appellant.

**No. 17-4278**

UNITED STATES OF AMERICA,

    Plaintiff – Appellee,

v.

GENPHAR, INC.,

    Defendant – Appellant.

Appeal from the United States District Court for the District of South Carolina, at Charleston. Bruce H. Hendricks, District Judge. (2:11-cr-00511-BHH-2; 2:11-cr-00511-BHH-3)

Argued: January 27, 2022        Decided: February 28, 2022

Before WILKINSON and AGEE, Circuit Judges, and FLOYD, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Linda S. Sheffield, Marietta, Georgia, for Appellants. Nathan S. Williams, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee. **ON BRIEF:** Peter M. McCoy, Jr., United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Vaxima, Inc. and GenPhar, Inc. ("Corporate Defendants") were convicted of over twenty criminal offenses, including wire fraud, theft of government property, and conspiracy to defraud the United States. Each conviction arose from the fraudulent retention of federal funds that were awarded pursuant to three Cooperative Research and Development Agreements ("CRADAs") the Corporate Defendants held with federal agencies. They raise myriad pretrial-, trial-, and sentencing-related challenges on appeal. For the reasons that follow, we affirm.

I.

In April 2011, Dr. Jian-Yun "John" Dong, Dr. Danher Wang, GenPhar, and Vaxima were indicted by a federal grand jury for thirty-four violations of federal law. Dr. Wang later entered into a plea agreement with the Government, under which she agreed to cooperate with the Government and testify against Dr. Dong and the corporations.

GenPhar was established as a for-profit corporation in 1999 for the purpose of performing pharmaceutical and vaccine research. Dr. Dong was GenPhar's President and Chief Executive Officer, and also served on its Board of Directors. Dr. Wang—Dr. Dong's then-wife—was GenPhar's Vice President of Research and Development.

Vaxima "is [a] small subsidiary company" "under GenPhar" that "solely belong[s] to Dr. Dong." Gov't Supp. J.A. 34–35.[1] It provides vaccine production services to GenPhar ostensibly as a cost-saving mechanism. Vaxima paid its employees with money that GenPhar provided to it. But Vaxima paid GenPhar rent for the space in which it performed its work, and it also paid for Dr. Dong's "corporate car[] [and] expenses." Gov't Supp. J.A. 751.

When GenPhar was first founded, it was funded almost exclusively by investors.[2] Indeed, over the course of its existence, GenPhar received nearly $13 million in investor funds. Eventually, those funds ran low, and GenPhar began to operate primarily (and after 2009, exclusively) on funds it obtained from CRADAs.

The CRADAs at issue here are different from a typical governmental grant. Under the terms of a standard grant, an agency provides the grantee with a lump sum of money and the grantee has discretion to use that money as it deems fit in pursuing the ultimate goal described in the grant application. CRADAs, however, are different. A federal agency and a private entity "enter into a collaborative effort to use" congressionally-earmarked funds for a specific function—in this case, vaccine research. Gov't Supp. J.A. 1176. Unlike standard grants, CRADAs entail "substantial Federal scientific or programmatic

---

[1] The parties filed four different appendices. Herein, we reference three of them: the initial Joint Appendix ("J.A."), the Government's supplemental appendix ("Gov't Supp. J.A."), and Defendants' second supplemental appendix ("Defs.' 2d Supp. J.A.").

[2] The record does not reflect the shareholders of GenPhar or Vaxima or in what percentages or capacities shares were held. Similarly, the record does not reflect whether GenPhar's "investors" received equity shares or debt instruments for their investments.

involvement," which "means that, after award, scientific or program staff" from the agency "will assist, guide, coordinate[,] and participate in project activities." Gov't Supp. J.A. 344.

Another notable difference between typical grants and CRADAs is that under a CRADA, the awardee does not have total discretionary spending power. Instead, a CRADA awardee is paid in accordance with achieving certain scientific "milestones" enumerated in the award. To receive a CRADA payment, the awardee must submit to the federal agency "progress reports" indicating which milestone(s) the awardee has achieved. Upon satisfactory review, the agency will release the money associated with that milestone to the awardee.

Relevant here, GenPhar was awarded three different CRADAs for vaccine research and production: one by the Army Medical Research Institute of Infectious Diseases ("the Army") that ran from 2002 to 2007; one by the Navy Medical Research Center that ran from 2005 to 2008; and one by the National Institutes of Health ("NIH") that ran from 2006 to 2011. These CRADAS collectively provided GenPhar approximately $15 million. Each federal agency was initially satisfied with the work that was performed.

Federal officials later testified at trial that if GenPhar saved some money on CRADA-funded work, then GenPhar was not required to refund the agencies that money, but only if it put those funds towards other proposed work specified in the CRADA. None of the CRADAS GenPhar held authorized it, or any other defendant, to use funds for lobbying political officials or to construct a new, freestanding research facility.

In 2009, Special Agent Larry Leonard of the Defense Criminal Investigative Service ("DCIS")—an investigative arm of the U.S. Department of Defense's Office of Inspector

5

General—began investigating whistleblower allegations made in a *qui tam* civil suit that GenPhar was committing fraud under its CRADA with the NIH. His investigation revealed evidence that GenPhar had submitted, and continued to submit, claims for payment and progress reports under all three CRADAs containing false statements. These false statements, which Dr. Dong approved and signed, certified that the Corporate Defendants had incurred certain costs in performing, or subcontracting, work that was required under any given CRADA. In fact, however, the work either had not been performed, or an undisclosed party performed it at a much lower cost. In the Government's view, this allowed the Corporate Defendants to unlawfully "profit" from the CRADAs. Special Agent Leonard discovered evidence that the Corporate Defendants were using these unlawful "profits" to build a brand-new research facility for GenPhar and Vaxima and to lobby certain political officials.

The evidence adduced at trial tracked Special Agent Leonard's findings. For example, GenPhar's CRADA with the NIH required GenPhar to hire a quality control director and provided GenPhar $70,000 per year for that position's salary. Though GenPhar certified to the NIH that it filled that position, it actually used two existing employees (including Dr. Wang) to conduct those duties, and retained the $70,000. Similarly, GenPhar's CRADA with the Army provided approximately $1 million for GenPhar to outsource two vaccine studies: one to the Medical University of South Carolina, to be performed on rabbits; and a second to an Army laboratory, to be performed on monkeys. GenPhar certified to the Army that it had outsourced both studies. Instead, Dr. Dong directed Dr. Wang to conduct the rabbit study in-house, which ended up costing less than

$15,000. And while GenPhar outsourced the monkey study, it never paid the Army laboratory the $614,250 it was owed for that work. GenPhar kept those funds.

GenPhar employees also testified at trial that at Dr. Dong's direction, the money retained from the various CRADAs was used to construct a new research facility for GenPhar and Vaxima ("the GenPhar Property" or "the Property"). The plans to construct the Property arose sometime in 2005, and construction began at some unspecified time thereafter. In 2010, while construction still was ongoing, an NIH official reviewing its CRADA with GenPhar asked to visit the new Property. After receiving a tour from Dr. Dong, the NIH official described the Property as "the Taj Mahal of scientific buildings." Gov't Supp. J.A. 134. The official asked Dr. Dong where the money came from to construct the building. He responded that investor money was the source of the construction funds. But according to the Government's accounting expert, Johnathan Vaughn, between January 1, 2005, and December 31, 2009, GenPhar had only received $2,684,882.56 in non-CRADA funds (including investor funds) while incurring $5,588,420.39 in construction-related invoices. And Dr. Dong himself admitted to Special Agent Leonard during a 2009 interview that GenPhar ran out of investor funds that year. Separately, trial testimony showed that hundreds of thousands of dollars of CRADA funds were used to lobby political officials on behalf of GenPhar and Dr. Dong.

## II.

Based on the course of conduct set forth above, a federal grand jury returned a thirty-four-count indictment against GenPhar, Vaxima, Dr. Dong, and Dr. Wang. Count One of

the operative Third Superseding Indictment ("TSI") alleged that Dr. Dong, the Corporate Defendants, and Dr. Wang (identified in the TSI as "Person A," J.A. 138) conspired to defraud the United States by obtaining payments under the CRADAs through false and fraudulent statements, in violation of 18 U.S.C. § 371. Count Seven alleged that the Corporate Defendants and Dr. Dong's receipt of a payment under its CRADA with the NIH constituted the theft of Government-owned property, in violation of 18 U.S.C. § 641. Finally, Counts Thirteen through Thirty-Four alleged that the false statements to federal agencies by the Corporate Defendants and Dr. Dong in order to obtain CRADA payments constituted wire fraud, in violation of 18 U.S.C. § 1343.[3]

All three defendants filed a number of pretrial motions, including several different motions to dismiss the indictment and a motion to suppress evidence that was seized pursuant to a search warrant that Special Agent Leonard obtained during his investigation. The presiding judge, Senior United States District Judge C. Weston Houck denied all of those motions.

The Corporate Defendants and Dr. Dong were tried together by a jury in 2014. The jury returned a guilty verdict against GenPhar as to Counts Seven and Thirteen through Thirty-Four; and against Vaxima as to Counts Seven, Thirteen through Fifteen, and Seventeen through Thirty-Four. The jury hung as to the remaining counts against the Corporate Defendants, and as to all counts against Dr. Dong. Judge Houck, who presided over the trial, declared a mistrial.

---

[3] Counts Two through Six and Eight through Twelve were dismissed before trial.

Shortly thereafter, the case was transferred to United States District Judge David C. Norton. The parties elected to have the retrial via a bench trial. In doing so, they waived their right to have Judge Norton issue written findings of fact, asking that he instead utilize a general verdict form. *See* Fed. R. Crim. P. 23(c). Judge Norton found GenPhar guilty of the conspiracy charge in Count One, and found Vaxima guilty of both the conspiracy offense in Count One and the outstanding wire fraud charge alleged in Count Sixteen. He also found Dr. Dong guilty of all counts.

Judge Norton then recused himself after the bench trial but before sentencing. The case was then transferred to United States District Judge Bruce H. Hendricks. The Corporate Defendants and Dr. Dong filed another litany of post-trial motions for a new trial, for a judgment of acquittal, and to dismiss the indictment, all of which were denied. Relevant here, Judge Hendricks imposed a fine of $6,423,199.66, and a monetary forfeiture judgment against each defendant jointly and severally in the amount of $3,211,599.83, the amount of CRADA funds unlawfully used for both political lobbying and constructing the GenPhar Property.

The Corporate Defendants timely filed a notice of appeal, making our jurisdiction proper under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

III.

The Corporate Defendants' arguments on appeal concern the district court's rulings on pretrial matters; issues arising during and after trial; and purported deficiencies in the district court's forfeiture order. They also assert that their convictions and sentences must

9

be reversed because both Judges Norton and Hendricks failed to recuse themselves in the face of alleged conflicts of interest. We address each category of claims in turn.

A.

Beginning with the Corporate Defendants' challenges to the district court's pretrial rulings, they claim that the district court erred by denying their pretrial motions to dismiss the indictment, as well as their various motions to suppress evidence. Finding no merit in any of these arguments, we affirm.

1.

The Corporate Defendants argue that the district court should have granted their motion to dismiss the TSI because it failed to allege an offense. *See* Fed. R. Crim. P. 12(b)(3)(B)(v). We review this claim de novo. *United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009).

In order to adequately allege an offense, an indictment "must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." *Id.* (citation omitted); *see* Fed. R. Crim. P. 7(c)(1). An indictment may also be legally insufficient if the facts alleged, even when taken as true, would not constitute a federal crime. *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004). Having reviewed the TSI with "heightened scrutiny," *Kingrea*, 573 F.3d at 191, we are satisfied that it adequately alleged the elements of each offense and contained sufficient factual allegations to inform the Corporate Defendants of the nature of the charges against them.

10

The Corporate Defendants primarily argue that the conduct underlying the TSI's offenses cannot be crimes; their conduct amounted, at most, to a breach of contract. They posit that this should have been a civil case, as there is no statute criminalizing fraud in the administration of CRADAs. We agree with the district court, however, that the various federal criminal statutes relating to fraud broadly apply to a plethora of fraud schemes, and properly encompass the conduct the Corporate Defendants were accused (and ultimately convicted) of here.

The Corporate Defendants also argue that Count Seven failed to allege an offense because, even accepting its allegations as true, there could be no theft of Government property. Specifically, they posit that the money held by the NIH, and paid to GenPhar, lost its federal character immediately upon payment. For the reasons explained by the district court, we conclude that the numerous supervision, reporting, and auditing requirements imposed in the CRADA process are sufficient to allege retention of Governmental control over those funds, making them the proper subject of an 18 U.S.C. § 641 offense. Gov't Supp. J.A. 1653–54. We therefore affirm the denial of the Corporate Defendants' pretrial motions to dismiss.

2.

Next, the Corporate Defendants claim that Special Agent Leonard's involvement in this case violated the Posse Comitatus Act ("PCA"), which provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

11

18 U.S.C. § 1385 (2012).[4] They ask us to either (1) suppress the evidence obtained pursuant to a search warrant that he obtained during his investigation, or (2) vacate their convictions.

Neither remedy is warranted in this case because there was no PCA violation. By statute, Congress has clarified that "[t]he provisions of [the PCA] *shall not apply* to audits and investigations conducted by . . . the Inspector General of the Department of Defense," the precise agency to which Special Agent Leonard belonged. 5 U.S.C. app. § 8(g) (emphasis added). That is in part because, again by statute, Congress bars any "member of the Armed Forces, active or reserve," from being appointed Inspector General of the Department of Defense. *Id.* § 8(a). There simply is no PCA issue here.

But even if there was a PCA violation, neither of the Corporate Defendants' requested remedies are available to them. *See United States v. Johnson*, 410 F.3d 137, 149 (4th Cir. 2005) (holding that, absent special circumstances not present in this case, "the exclusionary rule is [generally] not a remedy for violations of the [Act]" (citation omitted) (second alteration in original)); *United States v. Dong*, 731 F. App'x 180, 182 (4th Cir. 2018) (per curiam) ("By its terms, the remedy for a violation of the PCA is not to dismiss the criminal charges against the offender or reverse his convictions but to hold the

---

[4] The PCA has since been amended to also reference the Navy, Marine Corps, and Space Force. *See* National Defense Authorization Act for Fiscal Year 2022, Pub. L. No. 117-81, div. A, tit. X, § 1045(a), 135 Stat. 1541, 1904–05.

transgressor criminally liable."). We thus affirm the district court's rejection of the Corporate Defendants' PCA arguments made before and after trial.[5]

## B.

Moving to the Corporate Defendants' trial-related claims, they argue that there was insufficient evidence to support their convictions. Convictions stemming from either a bench or jury trial "must be upheld if, when viewing the evidence and all reasonable inferences therefrom in the light most favorable to the Government, there is substantial evidence to support them." *United States v. Simmons*, 11 F.4th 239, 270 (4th Cir. 2021) (citation and internal quotation marks omitted); *see United States v. Armel*, 585 F.3d 182, 184 (4th Cir. 2009) (applying these standards to bench trials). Because the parties waived their right to a written finding of facts from Judge Norton, who presided over their bench trial, "[i]t follows that we must assume that the trial court found in favor of the Government with respect to each and every" element of the relevant offenses. *Lustiger v. United States*, 386 F.2d 132, 135 (9th Cir. 1967).

Beginning with Count One, the conspiracy claim, the Government had to prove (1) an agreement between multiple co-conspirators (2) to defraud the United States, and (3) an

---

[5] The Corporate Defendants also argue that the district court erred in rejecting their substantive challenges to the sufficiency of Special Agent Leonard's affidavit supporting the search warrant application. In addition to challenging the affidavit's signature requirement, statement of probable cause, and the particularity with which the affidavit describes the places to be searched and things to be seized, they claim that Special Agent Leonard knowingly utilized false information in that affidavit, in violation of *Franks v. Delaware*, 438 U.S. 154 (1978). Having reviewed the affidavit itself, the district court's relevant findings, Defs.' 2d Supp. J.A. 193–95, and the arguments presented on appeal, we discern no merit in any of these claims.

overt act by one of the conspirators in furtherance of the agreement. *United States v. Gosselin World Wide Moving, N.V.*, 411 F.3d 502, 516 (4th Cir. 2005); *see* 18 U.S.C. § 371. Relevant here, "[t]he actions of two or more agents of a corporation, conspiring together on behalf of the corporation, may lead to conspiracy convictions of the agents . . . and of the corporation." *United States v. Peters*, 732 F.2d 1004, 1008 (1st Cir. 1984). Upon review of the evidence introduced during the bench trial, we are satisfied that there was substantial evidence to support the district court's finding that Vaxima and GenPhar, through the acts of its agents, Dr. Dong and Dr. Wang, agreed and intended to defraud the United States and committed numerous overt acts in furtherance of that agreement.

Turning to Count Seven—theft of Government property—the Government had to prove that "(1) the [Corporate Defendants] stole, fraudulently received, or converted to [their] own use (2) money of the United States (3) with the intent to permanently or temporarily deprive the [G]overnment of that money." *United States v. Hamilton*, 699 F.3d 356, 363 (4th Cir. 2012); *see* 18 U.S.C. § 641. As a general principle, despite the fact that GenPhar and Vaxima are corporations, they may be held criminally liable for the acts of their agents and employees "done within the scope of their employment with the intent to benefit the corporation." *Mylan Lab'ys, Inc. v. Akzo, N.V.*, 2 F.3d 56, 63 (4th Cir. 1993).

Count Seven specifically related to a $955,085.51 request for payment under GenPhar's CRADA with the NIH for the time period of July 1, 2008, through September 30, 2008, which certified to the NIH that GenPhar incurred those costs "for the purpose and conditions of the grant or agreement." Gov't Supp. J.A. 539. Part of that money, the CRADA specified, was to be used by GenPhar to purchase a $233,900 piece of equipment.

14

However, a GenPhar employee testified that GenPhar did not purchase that equipment; it simply retained that money for its own use. Moreover, under the governing legal principles identified by Judge Houck in his earlier ruling on the Corporate Defendants' motion to dismiss the indictment, *see* Gov't Supp. J.A. 1650–54, there is substantial evidence to support Judge Norton's finding that the NIH funding at issue retained its federal character even after being transferred to GenPhar. Sufficient evidence therefore supports the § 641 conviction.

Finally, as to the wire fraud convictions in Counts Thirteen through Thirty-Four, the Government was required to prove (1) the existence of a scheme to defraud the Government and (2) that the Corporate Defendants used the wires to further that scheme. *United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012); *see* 18 U.S.C. § 1343. The records developed during both the jury and bench trials provide sufficient evidence for the relevant factfinders to conclude that for each instance listed in the TSI, the Corporate Defendants (through their agents and employees) made false statements to federal agencies to induce those agencies to pay them money through use of the wires. We therefore affirm the Corporate Defendants' convictions *in toto*.[6]

---

[6] The Corporate Defendants further posit that their convictions must be vacated because the Government (1) constructively amended the TSI through its presentation of evidence at trial, (2) failed to disclose material exculpatory and/or impeachment evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and (3) knowingly presented false evidence at trial, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). After thoroughly reviewing the record and the Corporate Defendants' extensive arguments on appeal, we discern no merit in these claims.

C.

We proceed now to the Corporate Defendants' challenges to their sentences, which exclusively focus on the district court's forfeiture order. *See Libretti v. United States*, 516 U.S. 29, 38–39 (1995) ("Forfeiture is an element of the sentence imposed *following* conviction[.]"). First, citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), they argue that the forfeiture order was imposed in violation of their Sixth Amendment right to a jury trial. Second, they claim that there was no statutory authority for the district court's forfeiture order. Lastly, they posit that the forfeiture order must be vacated in light of the Supreme Court's decision in *Honeycutt v. United States*, 137 S. Ct. 1626 (2017). We address each claim in turn.

1.

In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Relying on this maxim and the Supreme Court's decision in *Southern Union Co. v. United States*, 567 U.S. 343 (2012), the Corporate Defendants argue that the forfeiture order here violates the Sixth Amendment because the district judge—not the jury—made all of the relevant factual findings. As we explained in *United States v. Day*, 700 F.3d 713 (4th Cir. 2012), however, this argument lacks merit. "[N]o statutory or other maximum limits the amount of forfeiture, [so] a forfeiture order can never violate *Apprendi*," and "the Supreme Court's decision in *Southern Union* [did not] change this fact." *Id.* at 732–33 (citation and internal quotation marks omitted).

16

2.

The Corporate Defendants next assert that there was no statutory basis for the district court's forfeiture order. Our de novo review of this issue, *see United States v. Martin*, 662 F.3d 301, 306 (4th Cir. 2011), leads us to reject this contention.

Pursuant to 28 U.S.C. § 2461(c), if a defendant is accused of a crime "for which the civil or criminal forfeiture of property is authorized," then "the Government may include notice of the forfeiture in the indictment." If the defendant is convicted, then "the court *shall* order the forfeiture of the property as part of the sentence." *Id.* (emphasis added).

Relevant here—and as specified in the TSI—one statute providing for the civil forfeiture of property is 18 U.S.C. § 981. Among other subsections, § 981(a)(1)(C) permits the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." *Id.*

The relevant offenses of conviction here all fall within § 981(a)(1)(C). The offenses in Count Seven (theft of Government property, 18 U.S.C. § 641) and Counts Thirteen through Thirty-Four (wire fraud, 18 U.S.C. § 1343) are explicitly included in the definition of "specified unlawful activity" set forth in 18 U.S.C. § 1956(c)(7). And Count One alleged "a conspiracy to commit such offense[s]." § 981(a)(1)(C). Accordingly, we are satisfied that there was a statutory basis for the forfeiture order.

3.

Next, GenPhar argues that the forfeiture order entered against it and Dr. Dong violates the rule announced by the Supreme Court in *Honeycutt*. Limiting our analysis only to GenPhar, we discern no valid basis for vacating the forfeiture order.[7]

In *Honeycutt*, the Supreme Court unanimously held that 21 U.S.C. § 853(a)(1) does not permit district courts to impose forfeiture orders under a joint and several liability theory. 137 S. Ct. at 1632–33. Instead, the Court explained, the statute requires proof that a defendant *personally* obtained the assets to be forfeited. *Id.* at 1633.

---

[7] The Corporate Defendants' consolidated Opening and Reply Briefs focus exclusively on how *Honeycutt*'s holding applies to the forfeiture orders entered against GenPhar and Dr. Dong. *E.g.*, Opening Br. 154 ("*Honeycutt* and the subsequent rulings by this Court apply precisely to the instant case, because [1] there is no asset or proceeds obtained by GenPhar or Dr. Dong through a crime; [and] [2] neither GenPhar nor Dr. Dong actually acquired any property as the result of the 'using contract funds for purposes inconsistent with the terms and conditions[.]'"); Reply Br. 41–42 ("The Government failed to prove that GenPhar actually obtained any funds or property through a crime, and failed to prove the prerequisite nexus between GenPhar's research facility to a crime."). Because Dr. Dong is not a party to this appeal, we have no occasion to consider how *Honeycutt*'s rule might apply to him.

As to Vaxima, the Corporate Defendants' consolidated briefing on this issue never once mentions it, let alone discusses how *Honeycutt* applies to Vaxima. Accordingly, Vaxima has forfeited appellate review of this issue. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." (cleaned up) (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015)); *see also United States v. Caldwell*, 7 F.4th 191, 207 n.13 (4th Cir. 2021) (applying this rule to a criminal case); *United States v. Stewart*, 765 F. App'x 915, 919 n.2 (4th Cir. 2019) (per curiam) (holding that one defendant, Grant, waived appellate review of an issue that both he and his co-defendant, Stewart, raised before the district court because their consolidated opening brief "only advance[d] Stewart's argument").

The forfeiture order in this case was not entered pursuant to § 853(a). Rather, as detailed previously, the forfeiture order against GenPhar was entered pursuant to 18 U.S.C. § 981(a)(1)(C), as incorporated by 28 U.S.C. § 2461(c). GenPhar argues that *Honeycutt*'s logic extends to these provisions, and requires that the forfeiture order entered against it be vacated because the district court utilized a joint and several liability theory.

Assuming, without deciding, that *Honeycutt*'s rule applies to § 981(a)(1)(C) forfeiture orders, it is nonetheless evident from the record established at both trials that GenPhar itself obtained the entirety of the proceeds constituting the forfeiture money judgment. *See* Fed. R. Crim. P. 32.2(b)(1)(B) ("The court's [forfeiture] determination may be based on evidence already in the record[.]"). Several witnesses, including Dr. Wang, Elaine Van Voris (one of GenPhar's accountants), and the Government's accounting expert, Vaughn, testified that CRADA funds were deposited into a single GenPhar account that was used to both receive money and make payments. The district court received similar testimony from Vaughn during a hearing on the forfeiture issue. Thus, in order to find that there were forfeitable "proceeds" from the Corporate Defendants' offenses, the district court necessarily had to find as fact, and ultimately found, that GenPhar "[came] into possession of" or "acquire[d]" the proceeds of the offenses of conviction. *Honeycutt*, 137 S. Ct. at 1632 (citation omitted). We therefore affirm the district court's forfeiture order as

to GenPhar for the full amount of the proceeds of the offenses of conviction, even under the guise of joint and several liability.[8]

## D.

Finally, the Corporate Defendants lodge a general attack on their convictions stemming from the bench trial before Judge Norton, and the sentences imposed by Judge Hendricks, because both judges allegedly failed to recuse themselves in the face of known conflicts of interest.

For the reasons stated by the district court, we hold that Judge Norton did not violate 28 U.S.C. § 455(a) by failing to recuse himself earlier in the proceedings. *See* Defs.' 2d Supp. J.A. 1484–85. And assuming that the claims vis-à-vis Judge Hendricks are properly preserved for appellate review, the Corporate Defendants have failed to meet their burden to show that Judge Hendricks' impartiality could have been reasonably questioned. Accordingly, we discern no error.

## IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

[8] GenPhar also argues that there was insufficient evidence underlying the district court's determination of the amount of forfeitable "proceeds," and that the district court clearly erred in determining the value of the GenPhar Property, which was forfeited as substitute property. Having reviewed these arguments and the record on appeal, we discern no reversible error.